STATE OF NORTH CAROLINA v. JOHN DENNIS DANIELS

No. 506A90

(Filed 29 July 1994)

1. **Constitutional Law § 343 (NCI4th)— first-degree murder— presence of defendant—ruling on pretrial motion—communicated by telephone**

    There was no error in a capital prosecution for first-degree murder, and, assuming error, there was no prejudice, where the trial judge heard arguments on a suppression motion on a Friday, indicated that she would make her ruling before opening statements and would telephone counsel to give them her ruling, she made separate telephone calls to counsel to announce her ruling on Sunday, the conversations were not recorded, and defendant was not present. The trial judge's telephone call to the prosecution was a stage of the trial at which defendant's presence was not mandatory because the judge's statements indicate that the decision had already been made and there is no indication that the issue was open to further discussion or that further discussion or argument actually occurred. Defendant's absence could not have adversely affected his opportunity to defend. Assuming error, there was no prejudice because defendant was present during the discussion of the matter in court on Friday and had an opportunity to express any objection to the ruling on Monday when it was announced in open court, and the judge acknowledged the communication on the record and indicated the substance of the calls.

    **Am Jur 2d, Criminal Law §§ 910 et seq.**

    **Right of accused to be present at suppression hearing or at other hearing or conference between court and attorneys concerning evidentiary questions. 23 ALR4th 955.**

2. **Constitutional Law § 343 (NCI4th)— first-degree murder— presence of defendant—pretrial conference concerning juror ultimately excused**

    There was no prejudicial error in a first-degree murder prosecution where a prospective juror stated during voir dire that she

STATE v. DANIELS

[337 N.C. 243 (1994)]

had an airline ticket for a vacation and did not know whether it was refundable but could still render a fair decision; she discovered that her ticket was nonrefundable and could not be used for another feasible flight and that her vacation accommodations were likewise nonrefundable after being selected as a juror; in a discussion on the record, she said the financial loss that would result from her jury service would prevent her from being fair and impartial; the trial judge asked to see counsel for an in-chambers conference; and the juror was ultimately excused. Although it is error for the trial court to conduct a chambers conference with counsel for the State and counsel for defendant in defendant's absence, the State established beyond a reasonable doubt that the error was harmless because defendant was present during the juror's statements regarding her personal situation and was fully apprised of the facts underlying the reasons for the juror's excusal, and the court excused the juror from further jury service on the record in open court, with defendant being present and fully apprised of both the ruling and the facts underlying it and having full opportunity to be heard and to lodge any objection he might have.

**Am Jur 2d, Criminal Law §§ 695, 696.**

**Validity of jury selection as affected by accused's absence from conducting of procedures for selection and impaneling of final jury panel for specific cases. 33 ALR4th 429.**

3. **Arrest and Bail § 135 (NCI4th)— first-degree murder— right to communicate with friends and counsel after arrest—no violation**

There was no error in a first-degree murder prosecution from the introduction of a letter defendant wrote to the governor after he was arrested in which he stated that he was not crazy and that what he did was premeditated where defendant contended that the letter was obtained in violation of his statutory right to be informed of his right to communicate with friends and counsel without unnecessary delay. Defendant was arrested between 12:45 and 12:50 a.m. and gave his letter to an officer shortly after they arrived at the Law Enforcement Center at 1:20 a.m.; at most, one hour had elapsed between the time of defendant's arrest and his delivery of the letter and the officer was engaged in considerable activity during this time, much of it involving interactions between himself and defendant. There had been no unnecessary

delay in advising defendant of his rights under N.C.G.S. § 15A-501(5) at the time defendant wrote the letter and handed it to the officer.

**Am Jur 2d, Criminal Law §§ 737, 738.**

**Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.**

4. **Evidence and Witnesses § 2101 (NCI4th)— first-degree murder—defendant's mental state following confession— officer's testimony excluded—no error**

The trial court did not err in a first-degree murder prosecution by excluding portions of the testimony of a law enforcement officer regarding defendant's mental state following his confession where defendant's first questions were improper because they pertained only to whether defendant "could have waived" his rights and his last question, as to whether defendant understood the *Miranda* form, was also improper as calling for a legal conclusion. Witnesses may testify as to whether defendants had the capacity to understand certain words on the *Miranda* form, such as "right" or "attorney," but may not testify as to whether defendants had the capacity to waive their rights.

**Am Jur 2d, Expert and Opinion Evidence § 167.**

5. **Evidence and Witnesses § 2840 (NCI4th)— first-degree murder—police officer not allowed to refresh memory— transcript of telephonic transmission—no prejudicial error**

There was no prejudicial error in a first-degree murder prosecution where defendant asked a police officer on cross-examination whether he had told another officer that defendant was "all coked up"; the officer had responded that he did not recall making that statement; and the trial court refused to allow defendant to refresh the officer's memory with a transcript of a tape recording of a telephonic transmission. Although the court erred in not permitting defendant to refresh the officer's recollection, there was no prejudice because there was substantial evidence before the jury, offered by both the State and defendant, pertaining to defendant's substance use on the day of the offense.

**Am Jur 2d, Witnesses §§ 440 et seq.**

**Refreshment of recollection by use of memoranda or other writings. 82 ALR2d 473.**

**Evidence: admissibility of memorandum of telephone conversation. 94 ALR3d 975.**

6. **Evidence and Witnesses § 2593 (NCI4th); Attorneys at Law § 38 (NCI4th)— first-degree murder—condition of defendant after arrest—testimony of defendant's attorney**

The trial court did not err in a first-degree murder prosecution by excluding the testimony of the public defender, in whose office one of defendant's attorneys worked, or by denying that attorney's motion to withdraw, where the shift supervisor at the jail refused to accept defendant after his arrest because of information indicating potential suicidal tendencies; the shift supervisor requested that the Public Defender seek an emergency commitment of defendant to allow for a mental evaluation; the Public Defender spoke to defendant for ten to fifteen minutes; she observed that defendant was shaking and failed to make eye contact, was unresponsive and indirect, and she had to repeat some questions several times; and the trial court refused to allow defendant's attempt to elicit testimony from the Public Defender about the interview or to allow the withdrawal of one of defendant's attorneys who worked in the Public Defender's office. The substance of the Public Defender's testimony was revealed through other testimony. If other witnesses are available who can provide the information sought, it is not error not to permit an attorney for a party to testify and, because evidence was admitted that adequately substituted for the Public Defender's testimony, defendant's right to present evidence was neither implicated nor violated by the trial court's refusal to allow his attorney to withdraw.

**Am Jur 2d, Attorneys at Law §§ 173-175; Witnesses §§ 225 et seq.**

**Defense attorney as witness for his client in state criminal case. 52 ALR3d 887.**

**Disqualification of attorney because member of his firm is or ought to be a witness in case—modern cases. 5 ALR4th 574.**

7. **Homicide § 563 (NCI4th)— first-degree murder—instructions—quarrel or struggle—requested instruction not given**

There was no error in a first-degree murder prosecution where the trial court failed to give defendant's requested instruc-

tion to the jury concerning a killing committed during a quarrel or struggle where the instruction was not supported by the facts of the case.

**Am Jur 2d, Homicide §§ 525 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

8. **Homicide § 271 (NCI4th)— felony murder—money taken as afterthought—evidence sufficient**

There was no error in submitting the felony murder theory with the predicate felony of common law robbery where defendant admitted in his confession that he intended to and did ask the victim for money; when she responded that she was going to call his mother, defendant punched her, strangled her, and took $70.00 to $80.00 from her wallet; defendant stated that he was having financial problems and that he could lose his house; and defendant said, "Bills set me off." Although defendant contends that the evidence shows only that he took the money as an afterthought and that the State has failed to prove that the money was taken from the victim's presence, defendant's statements that he went to the victim's house to ask for money and that he did ask for money are sufficient to establish that the taking of money and the use of force were part of a single transaction.

**Am Jur 2d, Homicide § 442.**

**What felonies are inherently or foreseeably dangerous to human life for purposes of felony-murder doctrine. 50 ALR3d 397.**

9. **Evidence and Witnesses § 2296 (NCI4th)— first-degree murder—psychiatric expert—defendant not personally interviewed**

The trial court did not err in a first-degree murder prosecution by overruling defendant's objection to testimony by the State's psychiatric expert where the expert had not personally interviewed defendant. While diagnoses based on live interviews may be more reliable, there is no evidence that opinions based upon extensive research of psychiatric files of a defendant, written evaluations of defendant by other doctors, and interviews with defendant's friends and family are inherently unreliable. N.C.G.S. § 8C-1, Rule 702 does not require that an expert personally interview a defendant in order to express an opinion about

that defendant's mental condition; any deficiency in the evaluation may be adequately revealed by cross-examination.

**Am Jur 2d, Expert and Opinion Evidence § 187.**

**10. Criminal Law § 1355 (NCI4th)— first-degree murder—mitigating circumstances—no significant history of prior criminal conduct**

There was no error in a first-degree murder prosecution in the instructions on the mitigating circumstance of no significant history of prior criminal conduct where the instruction on the circumstance limited it to the previous ten years as defendant had done when he presented the evidence. Thus, the trial court instructed the jury in the only way supported by the evidence. Any possible prejudice to defendant that may have resulted from the limitation of the instruction was rendered harmless by the peremptory instruction that defendant was never convicted of a felony.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**11. Criminal Law § 1363 (NCI4th)— first-degree murder—nonstatutory mitigating circumstances—instructions on mitigating value**

The trial court did not err in a first-degree murder prosecution by instructing the jury that it could refuse to consider nonstatutory mitigating evidence if it deemed that the evidence had no mitigating value. The North Carolina Supreme Court has repeatedly determined that nonstatutory mitigating circumstances did not necessarily have mitigating value.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**12. Criminal Law § 1349 (NCI4th)— first-degree murder—statutory mitigating circumstances—instructions—mitigating value**

The trial court did not err in a first-degree murder prosecution by not specifically instructing the jury that the statutory mitigating circumstances have mitigating value where defendant contended that the jurors would have become confused based on the fact that they were told to determine whether nonstatutory mitigating circumstances had mitigating value. The court instructed the jury as to statutory mitigating circumstances before it gave its instructions as to the nonstatutory circum-

stances and the instructions given were in accord with the pattern jury instructions.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**13. Criminal Law § 454 (NCI4th)— first-degree murder—sentencing—prosecutor's arguments—jury's responsibility**

Any impropriety in a prosecutor's closing argument in a sentencing hearing for first-degree murder was not so gross that the trial court should have intervened *ex mero motu* where defendant contended that the prosecutor erroneously diminished the jury's responsibility but the overall context of the prosecutor's statements emphasized that recommending death was tantamount to saying that the aggravating circumstances found were sufficient to warrant the imposition of the death penalty and that it would be the judge who would impose the sentence, and that the jurors should not think of the sentence as "taking out a vendetta" or "bringing politics into the court," but as simply "following the law."

**Am Jur 2d, Trial §§ 572 et seq.**

**14. Criminal Law § 454 (NCI4th)— first-degree murder—sentencing—prosecutor's argument—Biblical references**

Biblical references in the prosecutor's argument in a first-degree murder sentencing hearing were not so grossly improper as to require intervention of the trial court *ex mero motu* where the Supreme Court did not perceive prejudice and in light of defense counsel's use of the Bible in his closing argument.

**Am Jur 2d, Trial §§ 572 et seq.**

**15. Criminal Law § 1341 (NCI4th)— first-degree murder—aggravating circumstances—pecuniary gain**

The trial court did not err in a first-degree murder sentencing hearing by submitting the aggravating circumstance of pecuniary gain where the evidence showed that defendant had confessed that he intended to and did ask the victim for money and that he killed her and took money from her purse when she refused to give it to him.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**16. Criminal Law § 1325 (NCI4th)— first-degree murder—sentencing—mitigating circumstances—instructions**

The trial court did not err in a capital sentencing hearing by instructing the jury that each juror "may" consider mitigating cir-

cumstances found to exist when weighing the aggravating and mitigating circumstances. This instruction was found to be without error in *State v. Lee,* 335 N.C. 244.

**Am Jur 2d, Trial §§ 1441 et seq.**

## 17. Constitutional Law § 371 (NCI4th)— death penalty—not unconstitutional

The North Carolina death penalty is not unconstitutional based upon the heinous, atrocious, or cruel aggravating circumstance being vague and arbitrary.

**Am Jur 2d, Criminal Law § 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

## 18. Criminal Law § 1373 (NCI4th)— first-degree murder—death penalty—not disproportionate

A death penalty was not disproportionate where the aggravating circumstances were supported by the evidence, the jury did not sentence defendant while under the influence of passion, prejudice, or any other arbitrary factor, and the sentence was not disproportionate. Defendant entered the home of his aunt asking for money; when she said she would not give him any money and threatened to call his mother, defendant proceeded to strike his aunt numerous times and then strangled her with a cord he wrapped around her neck three times; he dragged the body down the hall, making sure not to leave any fingerprints on the body; he left to spend the money he had stolen on cocaine and then went to his house, where he smoked cocaine and brutally and viciously beat his wife and son with a hammer; and he did not attempt to get medical attention for any of his victims.

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstances that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**19. Criminal Law § 1042 (NCI4th)— assault—conviction for lesser offense—consolidated judgment including greater offense**

A defendant was entitled to a new sentencing for three assault convictions where the indictments included the felony of assault with a deadly weapon inflicting serious injury, the jury found defendant guilty of the lesser charge of assault with a deadly weapon, a misdemeanor, and the judgment and commitment sheet indicate that the judge sentenced defendant on the basis of the felony. Even though defendant's assault convictions were consolidated, the misapprehension may have affected defendant's sentence.

**Am Jur 2d, Criminal Law § 537.**

Justice PARKER did not participate in the consideration or decision of this case.

Chief Justice EXUM concurring in part and dissenting in part.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Fulton, J., at the 27 August 1990 Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for assault with a deadly weapon with intent to kill inflicting serious injury, two counts of assault with a deadly weapon, and attempting to burn a dwelling house was allowed 14 February 1992. Heard in the Supreme Court 13 May 1992.

*Michael F. Easley, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Benjamin Sendor, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

Defendant was properly indicted for and found guilty at a capital trial of murder in the first degree of his aunt, Isabelle Daniels Crawford; common law robbery of Ms. Crawford; assault with a deadly weapon with intent to kill inflicting serious injury against his wife, Diane Daniels; assault with a deadly weapon against his neighbor, Glenn Funderburke; and attempting to burn a dwelling house. He was also indicted for assault with a deadly weapon inflicting serious injury against his son, Jonathon Maurice Daniels, but the jury only

found defendant guilty of assault with a deadly weapon against his son. His conviction of first-degree murder was based on theories of both felony murder and premeditation and deliberation. The jury then heard evidence relating to sentencing for first-degree murder, after which the jury found the existence of three aggravating circumstances and eleven mitigating circumstances and recommended that the defendant be put to death. The trial court sentenced defendant to death for first-degree murder, to a consecutive term of twenty years' imprisonment on the combined assault convictions, and to a consecutive term of ten years' imprisonment for attempting to burn a dwelling house. Judgment was arrested on the common law robbery conviction. We find no error in either the guilt-innocence phase of defendant's trial or in his capital sentencing proceeding. Therefore, we affirm the death sentence.

Evidence presented by the State in the guilt phase, which included defendant's *Mirandized* statement following his arrest, tended to show the following:

By 3:00 p.m. on 17 January 1990, defendant, John Dennis Daniels, had consumed two beers. Later, he consumed a fifth of wine and became "somewhat drunk." In the late afternoon or early evening, defendant went to the home of his seventy-seven-year-old aunt, Isabelle Daniels Crawford, to ask for money and to ask if Crawford would permit defendant's wife, Diane, and his twelve-year-old son, Maurice, to stay with Crawford. Defendant was behind on his rent, and he was having marital problems. Upon arrival at Crawford's house, defendant asked Crawford for money and asked her to take in his wife and son. Crawford did not give defendant any money and told defendant that she intended to phone his mother. Defendant told Crawford not to call his mother and then punched Crawford in the mouth, knocking her to the floor. Defendant, using an electrical cord he wrapped around his aunt's neck three times, strangled Crawford and dragged her body to the back of the house. He located Crawford's purse, removed $70.00 to $80.00, and left. In his pretrial statement, defendant stated, "I don't know why I killed her. Bills set me off. My lady has got bills. I tried to kill my lady."

After purchasing some cocaine, defendant walked around Charlotte and then returned to his home around 10:30 p.m. At home, he spoke briefly with his wife, Diane, and smoked some cocaine in their bathroom. After smoking the cocaine, defendant left the bathroom, holding a hammer. He approached his wife, who was lying on the bed in their bedroom, and began striking her in the head with the hammer. A struggle ensued during which defendant lost the hammer. Respond-

ing to defendant's wife's cries for help, their son, Maurice, joined the altercation. The fight moved into the hallway, where defendant hit his wife on the head with a kerosene heater. Defendant then chased his wife and son into the kitchen and den as defendant's wife attempted to get out of the house. Once in the den, defendant got a rock out of the aquarium and struck Maurice with it; defendant then found the hammer and hit Maurice in the head with it. Defendant's wife and son were finally able to run out the front door. Defendant pursued his wife outside and again hit her in the head with the hammer; he then returned to his house.

The Daniels' neighbor, Glenn Funderburke, was aroused by the commotion and went outside. Funderburke discovered defendant's son, Maurice, in his yard and took him into Funderburke's house. He then phoned the police and went to defendant's house to investigate. Upon entering defendant's house, Funderburke noticed flames near defendant. Defendant, holding a knife, threatened to kill Funderburke if Funderburke did not leave. Funderburke immediately returned to his home and again phoned the police.

At about 12:30 a.m., Charlotte Police Officer Thomas Griffith arrived on the scene, joining two other officers and a fire truck that had already arrived. Griffith observed the house on fire. After extinguishing the fire, the firemen brought defendant from the house and gave him oxygen. After defendant refused further medical treatment, Officer Griffith told defendant that he was going to jail for assault. At about 12:50 a.m., Griffith left the scene with defendant and proceeded toward the Law Enforcement Center.

In the car, defendant repeatedly urged Griffith to go to "Mint Street." When Griffith asked defendant why he was making this request, defendant responded: "I think I might have killed my aunt." Griffith then changed course slightly, followed defendant's directions, and at 12:55 a.m. arrived at the house identified by Daniels. After knocking on the back door and receiving no response, Officer Griffith entered the home. Inside, Griffith found a trail of blood beginning in a hallway. Following the trail to a bedroom, Griffith found Crawford's lifeless body lying face down on the floor, with a cord wrapped around her neck. A wastebasket was overturned, and the carpet disturbed; the remaining contents of the house were intact.

Griffith then took defendant to the Law Enforcement Center, arriving at 1:15 a.m. After smoking a cigarette and using the bathroom, defendant was placed in a room and given a pen and paper,

which he had requested. A few minutes later, defendant returned the paper, requesting that it be sent to the Governor. On it he had written:

Dear sir

I'm not crazy
What I did was premediated! [sic]
Time 1:42 1/18/90

John D. Daniels

I do not want a trial
I do not want my family around
I do not want news report [sic]

Shortly after receiving this letter, Griffith heard a noise in the room. He entered the room to find defendant on the floor with the drawstring from his pants around his neck. Another string was attached to a filing cabinet that was four feet, three inches high. Defendant was not injured.

At 2:00 a.m., Investigator Robert A. Holl arrived at the Center and spoke with Griffith. The two men took defendant to an interview room, and Holl left to investigate the crime scene. Holl returned between 4:30 a.m. and 4:45 a.m. Holl advised defendant of his *Miranda* rights, and at 5:05 a.m., defendant waived his rights by signing a waiver form. Holl proceeded to interview defendant. The interview, which concluded at 6:00 a.m., yielded a confession that detailed the events of the night before. After being taken to jail, defendant was committed to Dorothea Dix Hospital for two weeks. He was then returned to jail to await trial.

Dr. James Sullivan, the Mecklenburg County medical examiner and an expert in forensic pathology, performed an autopsy on Crawford. His examination revealed that Crawford had bled from the nose and mouth, her left eye was bruised, her lip was cut and bruised, and her nose was broken. There were also two contusions to her frontal scalp. There were abrasions on the sides and back of her neck and indications that the victim had been dragged. Crawford also had bruises on her right arm and hand which were consistent with defensive-type wounds.

Defendant's evidence was largely directed to showing a lack of premeditation and deliberation and an inability to understand his rights before making his confession. It tended to show as follows:

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

Lieutenant G.W. Bradshaw of the Mecklenburg County Sheriff's Department, the shift supervisor at the intake center on 17 and 18 January, saw defendant at 7:15 a.m. on 18 January when Holl and other officers brought defendant to the intake center. Pursuant to jail policy, Bradshaw had refused to accept defendant because of information given to Bradshaw indicating potential suicidal tendencies. Bradshaw requested that Public Defender Isabel Scott Day seek an emergency commitment of defendant to allow for a mental evaluation. Bradshaw and defendant spoke during the morning, but defendant did not always seem to understand what Bradshaw was saying. Mrs. Day spoke with defendant in Bradshaw's presence, but at times defendant did not respond to her.

Dr. William Tyson, a clinical psychologist, testified as an expert in clinical and forensic psychology. He interviewed defendant for one and one-half to two hours, administered psychological tests, and reviewed material from previous evaluations of defendant. According to Dr. Tyson, defendant had a chronic and pervasive mixed personality disorder, marked by unstable moods and behavior. Defendant was dependent on cocaine and alcohol and had a history of abusing and experimenting with drugs, including amphetamines, LSD, heroin, and tranquilizers. His substance abuse aggravated his personality disorder. As a result of these problems, defendant's emotional and social development skills were those of an eleven- or twelve-year-old child. According to Dr. Tyson, defendant's ability to think or evaluate his behavior would have been compromised to the point of being "inconsequential."

Psychiatrist John N. Bolinsky, Jr., also testified as an expert in psychiatry. Dr. Bolinsky had interviewed defendant twice and had reviewed defendant's medical records, including records for treatment of alcoholism. Dr. Bolinsky testified that defendant had an unspecified personality disorder. Based on this disorder and defendant's chronic substance abuse, coupled with his use of alcohol and cocaine on 17 January, Dr. Bolinsky testified that defendant would have been "perhaps 'paranoid' " and extremely impulsive. According to Dr. Bolinsky, defendant's ability to form a specific intent to kill his aunt "would have been profoundly impaired, if not in essence absent." Dr. Bolinsky explained that the combination of defendant's psychological problems, his chronic substance abuse, and his substance abuse on the day of the slaying would have made defendant impulsive and paranoid, causing him to act reflexively, without thinking.

STATE v. DANIELS

[337 N.C. 243 (1994)]

## GUILT PHASE ISSUES

**[1]** Defendant first challenges an *ex parte* communication made by the trial judge to the prosecutor as violating his right to be present at every stage of his trial.

On Friday, 14 September 1990, the jury was selected and the trial judge heard arguments on a suppression motion. The trial judge then indicated that although she would try to make a ruling later that day, she would certainly rule before opening statements. She stated that she would telephone the prosecutor and a defense attorney over the weekend to give them her ruling. They all said they could be contacted in their offices. Judge Fulton did not make a ruling that day.

On Sunday, 16 September, Judge Fulton made separate phone calls to counsel for the State and defense counsel to announce her ruling. Defendant was not present at these conversations, and the conversations were not recorded.

On Monday, 17 September, in open court, with defendant and all counsel present and after hearing brief additional argument by the prosecution, the trial judge stated:

> Okay. On the motion to suppress, which was heard on—evidence was presented on August 31 and arguments were heard on September 14—I notified counsel by telephone yesterday about a ruling. With regard to my ruling, as I indicated to counsel yesterday, the Court has denied the defendant's motion to suppress with regard to the statement that was given en route to the police station on January 17 or 18. The Court is denying the defendant's motion to suppress with regard to the letter to the governor. The Court is also denying the defendant's motion to suppress with regard to the written statement that was taken by Investigator Holl on January 18. The Court has indicated that its ruling is that the Court would grant the motion to suppress with regard to the statement that was taken on February 1. Ms. Shappert, with regard to your argument, I will consider those cases.

The Confrontation Clause in Article I, Section 23 of the North Carolina Constitution "guarantees an accused the right to be present in person at every stage of his trial." *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). "[A] defendant charged with capital murder 'has the right to be, and must be, personally present at all times in the course of his trial, when anything is done or said affecting him as to the charge against him . . . , in any material respect.' " *State v. Brog-*

*den,* 329 N.C. 534, 541, 407 S.E.2d 158, 163 (1991) (quoting *State v. Kelly,* 97 N.C. 404, 405, 2 S.E. 185, 185-86 (1887)) (alteration in original). This protection may apply to proceedings occurring outside the courtroom if they constitute a stage of the trial. *State v. Buchanan,* 330 N.C. 202, 221, 410 S.E.2d 832, 843 (1991) (citing cases involving the jury room and judges' chambers). Due to the public interests implicated, a capital defendant may not waive his right to presence. *State v. Huff,* 325 N.C. 1, 29, 381 S.E.2d 635, 651 (1989), *sentence vacated,* 497 U.S. 1021, 111 L. Ed. 2d 777 (1990), *on remand,* 328 N.C. 532, 402 S.E.2d 577 (1991).

If the defendant's absence from a proceeding constitutes error, a new trial is required unless the State demonstrates the error was harmless beyond a reasonable doubt. *Id.* at 34-35, 381 S.E.2d at 654. A record of what occurred at the proceeding may show the harmlessness of the error. *State v. Payne,* 328 N.C. 377, 402 S.E.2d 582 (1991). So may a subsequent memorialization on the record which reflects the substance of an off-the-record communication. *State v. Davis,* 325 N.C. 607, 627, 386 S.E.2d 418, 428, *cert. denied,* 496 U.S. 905, 110 L. Ed. 2d 268 (1989); *State v. Artis,* 325 N.C. 278, 297, 384 S.E.2d 470, 480 (1989), *sentence vacated,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand,* 329 N.C. 679, 406 S.E.2d 827 (1991).

Defendant contends that the trial judge's phone call to the prosecution was a stage of the trial at which his presence was mandatory. We conclude that the judge's communication to counsel of her ruling was not such a stage of defendant's trial. *See State v. Hudson,* 331 N.C. 122, 136, 415 S.E.2d 732, 739 (1992) (doubtful that conversation between judge and jurors concerning courtroom cameras is a "stage" of trial), *cert. denied,* —— U.S. ——, 122 L. Ed. 2d 136, *reh'g denied,* —— U.S. ——, 122 L. Ed. 2d 776 (1993); *State v. Buchanan,* 330 N.C. at 216-22, 410 S.E.2d at 840-44 (contains a full and well-documented discussion of what constitutes a stage of the trial at which, under the North Carolina Constitution, defendant is entitled to be present). The judge's statements indicate that the decision had already been made when counsel for prosecution and defense were contacted. There is no indication that the issue was open to further discussion or that further discussion or argument actually occurred. Since the judge was merely informing counsel of her predetermined decision, the defendant's absence could not have adversely affected his opportunity to defend. *Cf. State v. Buchanan,* 330 N.C. at 223-24, 410 S.E.2d at 845 (unless the defendant's confrontation rights are implicated, defendant has a right to be present at an unrecorded bench conference only

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

if his "presence would have a reasonably substantial relation to his opportunity to defend"); *State v. Payne*, 320 N.C. at 139, 357 S.E.2d at 612 (defendant had a right to presence especially because it could have had a "reasonably substantial relation" to his defense). We find no error in the *ex parte* communication.

Assuming *arguendo*, however, that there was error in the *ex parte* communication on the ground that it was a stage of the trial, we conclude the error was harmless beyond a reasonable doubt. Defendant was present during the discussion of the matter in court on Friday, 14 September, and had an opportunity to express any objection to the ruling on Monday, 17 September. *See State v. Brogden*, 329 N.C. at 541-42, 407 S.E.2d at 163 (charge conference among attorneys and judge in chambers harmless error where parties were subsequently afforded opportunity to argue in open court). Further, the judge acknowledged the communication on the record and indicated the substance of the calls. Read in context, the record is clear regarding the substance of the trial court's *ex parte* communications. *See State v. Hudson*, 331 N.C. at 137-38, 415 S.E.2d at 739-40 (*ex parte* communication between judge and jurors is harmless error where it is subsequently recorded and the communication was inconsequential to the case); *cf. State v. Payne*, 320 N.C. at 139-40, 357 S.E.2d at 612-13 (judge's "admonitions" are insufficient to indicate substance of communications by judge to jury). Having before us a sufficient record of the substance of the *ex parte* communications and given defendant's opportunity to challenge the ruling in open court when it was announced in his presence, we are convinced beyond a reasonable doubt that defendant was not prejudiced by the communications. Defendant's assignment of error on these grounds is without merit.

[2] Defendant next challenges a conference held in chambers, out of his presence, between the trial judge, defense counsel, and the prosecution.

During voir dire, Shelly Richardson, a prospective juror, stated that she had an airline ticket for a vacation in mid-September and that she did not know whether the ticket was refundable. She stated that while she would be concerned if the ticket was not refundable, she could still render a fair decision. After being selected as a juror, Richardson discovered that her ticket was nonrefundable and could not be used for another feasible flight. Her vacation accommodations were likewise nonrefundable. Richardson then said the financial loss that would result from her jury service would prevent her from being

fair and impartial. After this discussion on the record between the trial court and Richardson, the trial judge asked to see counsel for an in-chambers conference. Upon returning, the record reflects that the judge stated, "Ms. Richardson, what I'm going to do is take what you have said under consideration and not make a decision right now but I will notify you prior to the 13th. I will notify you." On 12 September, the judge excused Richardson, stating:

> Madam Reporter, if you could take this for the record. It's a matter involving Shelly Richardson. That she was selected as a juror, designated Juror No. 7. That subsequent to her selection as a juror and being informed of her duties as a juror, she contacted the clerk in this courtroom and indicated that she was having some personal problems and that she needed to come back into court. That the Court permitted her to reappear on Monday at approximately 4:30 P.M. That Ms. Richardson stated that she found out some additional information about her plane ticket that she indicated she had already paid for, and that she indicated it would not be a problem if she could get a refund. She also indicated she found out certain accommodations had been made for a trip and she was beginning to feel resentful and did not feel at that point that she would be fair and impartial. That based on that information and after consultation with counsel for the State and for the defendant, the Court has excused her from service as a juror, and we need to replace her. Okay.

As we said above, a capital defendant has a nonwaivable right to be present at every stage of the trial. This includes chambers discussions between the court and counsel. *State v. Brogden*, 329 N.C. at 541-42, 407 S.E.2d at 163. If defendant's absence is error, it is subject to harmless error analysis. *Id.* at 541, 407 S.E.2d at 163.

The State and defendant both rely on *State v. Buchanan*, 330 N.C. 202, 410 S.E.2d 832. We note that while *Buchanan* dealt with bench conferences at which the defendant was absent, it clearly also governs a chambers conference at which the defendant was absent.

As we held in *State v. Brogden*, it is error for the trial court to conduct a chambers conference with counsel for the State and counsel for defendant in defendant's absence. 329 N.C. at 541-42, 407 S.E.2d at 163. The State, however, has established beyond a reasonable doubt that the error was harmless. Defendant was present during juror Robinson's statements regarding her personal situation and was fully apprised of the facts underlying the reasons for the juror's

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

excusal, all of which are matters of record. After the chambers conference, Judge Fulton announced on the record in open court that she had not made a decision regarding Richardson but would "take what [Richardson] . . . said under consideration." Later, on the record in open court, Judge Fulton excused Richardson from further jury service, giving her reasons for ruling as set out above. Defendant, being present and fully apprised of both the ruling and the facts underlying it, had full opportunity to be heard and to lodge any objection he might have. As we did in *Brogden* under almost identical circumstances, we conclude that any error committed in the conduct of the chambers conference was harmless beyond a reasonable doubt.

Defendant argues that the State cannot prove harmlessness because "the record does not show whether the trial court made its own decision to excuse Ms. Richardson for cause or whether the trial court ultimately decided to excuse her because all counsel stipulated to her excusal during that conference." Defendant notes that under *State v. Ali*, 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991), he, and not his counsel, has the right to make the final decision regarding whether a juror should be peremptorily excused.

We find defendant's argument without merit. The record indicates that Judge Fulton in fact excused juror Richardson for cause, in which case defendant was not harmed by his absence from the conference. After the chambers conference, Judge Fulton stated to Richardson that she would "not make a decision right now." This statement is inconsistent with the assertion that the parties may have stipulated to the excusal at the conference. Further, the court stated that Richardson felt she could not be "fair and impartial." This conclusion is fully supported by the record, including Richardson's own assertions, and it is reason for excusal under N.C.G.S. § 15A-1212(9), which states that "[a] challenge for cause to an individual juror may be made by any party on the ground that the juror . . . is unable to render a *fair and impartial* verdict." N.C.G.S. § 15A-1212(9) (1988) (emphasis added). Finally, the court made no reference to "stipulations," but instead stated that "*the Court* has excused her from service as a juror." (Emphasis added.) We conclude that defendant's assignment of error is without merit.

[3] Defendant next challenges the admission into evidence of the letter he wrote to the Governor on the ground it was obtained in violation of his statutory right to be informed of his right to communicate with friends and counsel without unnecessary delay.

N.C.G.S. § 15A-501 provides in part:

Upon the arrest of a person, . . . a law-enforcement officer:

. . . .

(5) Must without unnecessary delay advise the person arrested of his right to communicate with counsel and friends and must allow him reasonable time and reasonable opportunity to do so.

N.C.G.S. § 15A-501(5) (1988). A substantial violation of Chapter 15A requires suppression of evidence obtained as a result of the violation. N.C.G.S. § 15A-974(2) (1988).

Defendant moved before trial to suppress (1) "statements . . . made by Defendant to law enforcement officers"; (2) "evidence related to or derived from samples of blood, hair, photographs, and fingerprints obtained from Defendant"; and (3) "evidence seized from Defendant's person, residence or belongings." During the hearing on the motion to suppress, defendant argued that N.C.G.S. § 15A-501 had been violated as a ground for suppressing the evidence described in the motion. The trial court denied defendant's motion.

We conclude that at the time defendant wrote the letter and handed it to Officer Griffith, there had been no unnecessary delay in advising defendant of his rights under N.C.G.S. § 15A-501(5). Daniels was arrested between 12:45 and 12:50 a.m. He gave his letter to Griffith shortly after they arrived at the Law Enforcement Center at 1:20 a.m. At most, one hour had elapsed between the time of defendant's arrest and his delivery of the letter. During this time, Officer Griffith was engaged in considerable activity, much of it involving interactions between him and defendant. After defendant was arrested, Griffith placed him in a vehicle and proceeded toward the Law Enforcement Center. On the way to the Law Enforcement Center, defendant requested that Griffith go to Crawford's house. Griffith went to the home, knocked on the back door, and eventually entered after hearing no response to his knock. Inside, he found Crawford's body and performed a cursory investigation. Griffith radioed his supervisor, waited for him to arrive, and spoke to him at that time. Griffith then proceeded to the Law Enforcement Center with defendant. Once at the Law Enforcement Center, defendant went to the bathroom, smoked a cigarette, and returned to the room. Within a few minutes, defendant submitted his letter to Griffith.

In *State v. Payne,* we held that a ninety-minute delay in bringing defendant before a magistrate was not an "unnecessary delay." 328 N.C. at 397, 402 S.E.2d at 594. Although delays in bringing defendants before magistrates entail different considerations than delays in informing defendants of their rights, under the circumstances here, we conclude there was no unnecessary delay within the meaning of N.C.G.S. § 15A-501(5).

Since the statute had not been violated when the letter was obtained, the statute is no bar to the introduction of the letter into evidence, and the admission of the letter cannot have been error.

[4] Defendant next challenges the ruling of the trial court excluding during the suppression hearing portions of the testimony of a law enforcement officer regarding defendant's mental state following his *Mirandized* confession.

Less than two hours after Holl and Davis completed their interrogation of defendant, he was taken to the intake center of the jail, where he was observed by Lieutenant G.W. Bradshaw of the Mecklenburg County Sheriff's Department. At a hearing to suppress Daniels' *Mirandized* statements to Holl and Davis, the defense called Bradshaw to testify as to his observations of defendant. After determining that Bradshaw was familiar with the *Miranda* waiver form, the following exchange occurred:

Q.   Based on your experience and familiarity with the Miranda form, do you have an opinion whether or not Mr. Daniels could have waived his Miranda rights?

[PROSECUTION]: Objection.

THE COURT: Sustained.

Q.   Lt. Bradshaw, you were in Mr. Daniels' presence for approximately how long?

A.   About an hour.

Q.   And based upon your involvement with him and your observation of him during that over-an-hour period of time, do you have an opinion as to whether or not he could waive his Miranda rights?

[PROSECUTION]: Objection.

THE COURT: Sustained.

Q.  Do you have an opinion as to whether or not he understood that form?

[PROSECUTION]: Objection. The form wasn't there.

THE COURT: Sustained.

Defendant then made an offer of proof in which he asked Bradshaw whether defendant could have understood his rights, and Bradshaw responded that defendant could not understand anything that was going on.

Any witness "who has had a reasonable opportunity to form an opinion" may give an opinion on a person's mental capacity. *State v. Evangelista,* 319 N.C. 152, 162, 353 S.E.2d 375, 383 (1987). A witness may not, however, testify that a legal standard has or has not been met. *State v. Rose,* 323 N.C. 455, 459, 373 S.E.2d 426, 429 (1988) (expert testimony that defendant could not have "premeditated or planned or deliberated" properly excluded). A witness may, therefore, testify as to whether the defendant had the capacity to understand certain words on the *Miranda* form, such as "right" or "attorney," but he may not testify as to whether the defendant had the capacity to waive his rights. *State v. Sanchez,* 328 N.C. 247, 251, 400 S.E.2d 421, 424 (1991).

Defendant's first questions pertained only to whether defendant "could have waived" his rights; therefore, they were improper. Defendant's last question, as to whether defendant understood the *Miranda* form, was also improper as calling for a legal conclusion. It was tantamount to asking whether defendant had the capacity to waive his rights, since the *Miranda* form contains a waiver provision. Even in the offer of proof, defendant's questions focused on whether defendant could have understood his "rights," clearly meaning *Miranda* rights; they thus called for legal conclusions. Here, no attempt was made to frame the questions in terms of whether defendant had the capacity to understand various key words that were put to him during the *Mirandizing* procedure, such as "right," "attorney," "waiver," etc. The trial court correctly excluded the questions that required a legal conclusion. Defendant's assignment of error is without merit.

[5]  Defendant next challenges the trial court's refusal to permit him to refresh the memory of a witness. The prosecution called Officer Griffith to testify. On cross-examination, defense counsel asked whether on the night of the arrest Griffith had told Sergeant DeLuca

that Daniels was "all coked up." Griffith responded that he did not recall making that statement. The defense then attempted to refresh Griffith's memory with the following transcript from a tape recording of a telephonic transmission between DeLuca and Deputy Captain Martin:

THE TIME NOW IS 0113.13.

OFFICER:	Captain, this is Deluca.

DUTY CAPT.:	Deluca, this is Captain Martin, what can I do for you.

OFFICER:	Alright [sic], let me tell you what happened. Tommy Griffith had the suspect in the ADW on Clanton, he refused treatment after stating he was losing conscious [sic] and a little bit combative, nothing out of the ordinary and he is coked up, okay. . . .

The trial court refused to permit defense counsel to let Griffith refer to the transcript to refresh his memory.

A party may use any material to refresh the memory of a witness, including statements made by persons other than the witness. *State v. Royal*, 300 N.C. 515, 528, 268 S.E.2d 517, 526 (1980). We conclude the trial court erred in not permitting defendant to refresh Officer Griffith's recollection by using the transcription of the telephonic transmission. We conclude, however, that the error did not sufficiently prejudice defendant so as to require a new trial.

The State introduced evidence of defendant's *Mirandized* confession to investigators Davis and Holl in which defendant stated that he had used alcohol and cocaine on the day of the offenses. Defendant's estranged wife testified that defendant smoked cocaine prior to assaulting her, and defendant's son further confirmed that defendant was "spaced out" and not acting like himself. Because there was substantial evidence before the jury, offered by both the State and defendant, pertaining to defendant's substance use on the day of the offense, the trial court's erroneous refusal to permit the defense to refresh Griffith's testimony as to what Griffith might have said on this same point was harmless beyond a reasonable doubt.

[6] Defendant next challenges the trial court's refusal to permit the testimony of the public defender, in whose office one of defendant's attorneys worked, and the denial of that attorney's motion to withdraw.

STATE v. DANIELS

[337 N.C. 243 (1994)]

After defendant's interrogation, he was taken to the intake center of the jail. Lieutenant Bradshaw, shift supervisor at the intake center, refused to admit defendant based on evidence of potential suicidal tendencies. Instead, Bradshaw went to the public defender's office to ask Mrs. Isabel Scott Day, the public defender, to seek an emergency commitment of defendant for a mental evaluation. At 8:15 or 8:20 a.m., Mrs. Day spoke to defendant for ten to fifteen minutes. Mrs. Day observed that defendant was shaking and failed to make eye contact. He was unresponsive and indirect, and Mrs. Day had to repeat some questions several times. Defendant told Mrs. Day that he thought his wife had been hurt. During a voir dire hearing, defendant attempted to elicit testimony from Mrs. Day regarding her interview with defendant, but the trial court refused to allow it on the ground that one of defendant's two attorneys, Mr. Jessup, worked in Mrs. Day's office. The trial court further denied Mr. Jessup's motion to withdraw.

A party's attorney or any other member of the attorney's firm ordinarily may not testify as a witness. N.C. Rules of Professional Conduct, Rule 5.2, Annotated Rules of North Carolina (Michie 1994). If other witnesses are available who can provide the information sought, it is not error not to permit an attorney for a party to testify. *State v. Simpson*, 314 N.C. 359, 373, 334 S.E.2d 53, 62 (1985).

Here, the substance of Mrs. Day's testimony about defendant's behavior was revealed through other testimony. Bradshaw observed defendant on the morning of 18 January for over an hour and was in the room for the entire ten to fifteen minutes during which Mrs. Day spoke with defendant. Bradshaw stated that he could hear everything being said during the conversation between Mrs. Day and defendant. Bradshaw further observed defendant after Mrs. Day left. Based on his conversations with defendant and his observations, Bradshaw testified that defendant was "[w]ithdrawn" and just stared at the floor. He further surmised that defendant was shaking and "possibly . . . in shock." Bradshaw testified that defendant did not seem to understand what was being said to him and that he was unresponsive to Mrs. Day.

Because adequate testimony to the same effect from Officer Bradshaw was admitted, it was not error to exclude Mrs. Day's testimony.

Defendant's second contention under this argument is that the trial court should have permitted Mr. Jessup to withdraw in order to enable Mrs. Day to testify. Counsel's motion to withdraw is usually committed to the sound discretion of the trial court, but where the

defendant's constitutional right to present testimony in his behalf is implicated, that decision is reviewed as a matter of law. *Cf. State v. Hutchins*, 303 N.C. 321, 336, 279 S.E.2d 788, 798 (1981) (ruling on whether appointed counsel shall be replaced is reversed only if an abuse of discretion, unless Sixth Amendment right is affected). Because evidence was admitted that adequately substituted for Mrs. Day's testimony, defendant's right to present evidence was neither implicated nor violated by the trial court's refusal to allow Mr. Jessup to withdraw. *Cf. State v. McNeil*, 46 N.C. App. 533, 538, 265 S.E.2d 416, 420, *disc. rev. denied*, 300 N.C. 560, 270 S.E.2d 114 (1980). Neither did the ruling amount to an abuse of discretion.

**[7]** Defendant next challenges the trial court's failure to give his requested instruction to the jury concerning a killing committed during a quarrel or struggle. "If . . . [a] killing was the product of a specific intent to kill formed under the influence of the provocation of the quarrel or struggle itself, then there would be no deliberation and hence no murder in the first degree." *State v. Misenheimer*, 304 N.C. 108, 114, 282 S.E.2d 791, 795-96 (1981); *accord State v. Corn*, 303 N.C. 293, 298, 278 S.E.2d 221, 224 (1981). "The critical question . . . [is] whether 'defendant did indeed deliberate, as distinguished from premeditate, the killing or did he form the intent to kill during a sudden passion provoked by the deceased [himself] which precluded any such deliberation.' " *Misenheimer*, 304 N.C. at 114, 282 S.E.2d at 796 (quoting *State v. Patterson*, 288 N.C. 553, 575, 220 S.E.2d 600, 616 (1975) (Exum, J., dissenting), *sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1211 (1976)). Defendant, citing *State v. Exum*, 138 N.C. 599, 618, 50 S.E. 283, 289 (1905), and *State v. Corn*, 303 N.C. at 297, 278 S.E.2d at 223, submitted to the trial court a written request for an instruction that "[t]he intent to kill must arise from 'a fixed determination previously formed after weighing the matter.' " At the charge conference, the trial court refused to submit the requested instruction. After the charge conference, defendant objected to the failure to include "an instruction on deliberation and intent to kill from State versus Misenheimer . . . [and] from State versus Corn."

We find that there was no error in refusing to give this instruction since it is not supported by the facts of this case. Defendant went to Crawford's house to ask for money and to ask Crawford to take in defendant's wife and son. After asking Crawford for money and whether she would take in his wife and son, Crawford told defendant that she was going to call defendant's mother. Defendant then told Crawford not to call, and defendant punched Crawford in the mouth.

Defendant then proceeded to strangle his seventy-seven-year-old aunt with a cord. The doctrine set forth in *Misenheimer* does not encompass this situation. *Cf. State v. Corn*, 303 N.C. at 298, 278 S.E.2d at 224 (where evidence showed that victim violently approached defendant, argued with him, fought with him, and accused him of being a homosexual, "evidence tends to show that defendant shot Melton [the victim] after a quarrel, in a state of passion, without aforethought or calm consideration"). Since defendant's proposed instruction is not supported by the facts, it was not error to refuse to give it.

**[8]** Defendant next challenges the trial court's submission of the felony murder theory on the ground that there was insufficient evidence to establish that he committed the predicate felony, common law robbery.

To support a conviction for common law robbery, "the State must offer substantial evidence that the defendant feloniously took money or goods of any value from the person of another, or in the presence of that person, against that person's will, by violence or putting the person in fear." *State v. Davis*, 325 N.C. at 630, 386 S.E.2d at 430. Where the taking occurs after the force was used, the defendant is guilty if the theft and force are "aspects of a single transaction." *State v. Faison*, 330 N.C. 347, 359, 411 S.E.2d 143, 150 (1991).

In his confession, defendant admitted that he intended to and did ask Crawford for money. When she responded that she was going to call his mother, defendant punched her, strangled her, and took $70.00 to $80.00 from her wallet. Defendant also stated that he was having financial problems and that he could lose his house. Defendant said, "Bills set me off."

Defendant contends that the evidence shows only that he took the money as an afterthought and that the State has failed to prove that the money was taken from Crawford's presence. We disagree.

In *State v. Faison*, we upheld a conviction of armed robbery where defendant was short on cash, intended to get money from the victim, violently assaulted the victim, stole items, and ransacked the house. 330 N.C. at 359, 411 S.E.2d at 150. With the exception of ransacking the house, the elements in *Faison* are present here. Defendant was having financial problems and feared that he could not pay his rent. Defendant went to Crawford's house intending to ask for money; while there, defendant beat and strangled Crawford and stole her money. *See also State v. Davis*, 325 N.C. 607, 630-31, 386 S.E.2d

418, 430-31 (common law robbery upheld where items were taken from victim near the time of her murder, defendant was seen near victim's apartment, defendant possessed stolen items, and victim's apartment was ransacked). Although defendant did not ransack Crawford's house, his statements that he went there to ask for money and that he did ask for money are sufficient to establish that the taking of money and the use of force were part of a single transaction. We conclude that it was not error to submit the felony murder theory with the predicate felony of common law robbery.

## SENTENCING PROCEEDING ISSUES

[9] Defendant's first assignment of error in the sentencing proceeding is that the trial court erred by overruling defendant's objection to testimony by the State's psychiatric expert because the expert had not personally interviewed defendant. We conclude that N.C.G.S. § 8C-1, Rule 702, which addresses the admission of an expert's opinion, does not require that an expert personally interview a defendant in order to express an opinion about that defendant's mental condition.

In *State v. Smith*, 315 N.C. 76, 101, 337 S.E.2d 833, 849 (1985), this Court held that "defendant erroneously concludes that a medical expert's testimony is limited to conditions he has personally observed." We held that the "correct limitation[] [is] that facts must be 'within his knowledge.' " *Id.* (quoting *State v. Bright*, 301 N.C. 243, 255, 271 S.E.2d 368, 376 (1980)). In *Smith*, we allowed a doctor to testify, based on a review of medical reports, that the victim had been sexually abused; the doctor was not required to actually examine the victim. In *State v. Bright*, 320 N.C. 491, 499, 358 S.E.2d 498, 502 (1987), we concluded that a doctor may rely on reports of an agency as the basis of his opinion on whether sexual abuse occurred. In *State v. Bonney*, 329 N.C. 61, 72-73, 405 S.E.2d 145, 151-52 (1991), a clinical psychiatrist testified that another expert may have incorrectly diagnosed a defendant based on flaws in the expert's interviewing technique and testing. The clinical psychiatrist, in effect, stated that contrary to the beliefs of defendant's expert's opinion, defendant did not have multiple personalities. The clinical psychiatrist reached this conclusion without actually interviewing the defendant.

In *Barefoot v. Estelle*, 463 U.S. 880, 77 L. Ed. 2d 1090 (1983), the United States Supreme Court rejected the contention that a defendant must be personally interviewed by a psychiatrist before the psychiatrist can testify about defendant's future dangerousness. The Court

noted that the defendant wanted the Court to adopt a rule which stated that psychiatric testimony about future dangerousness must be based on personal examination of the defendant and not on hypothetical questions presented to the expert at trial. The Court rejected this suggestion and held that the fact that experts do not examine defendants goes " 'to the weight of their testimony, not to its admissibility.' " *Id.* at 904, 77 L. Ed. 2d at 1111 (quoting *Barefoot v. State*, 596 S.W.2d 875, 887 (Tex. Crim. App. 1980), *cert. denied*, 453 U.S. 913, 69 L. Ed. 2d 996 (1981)). The Court took note of the fact that the American Psychiatric Association ("APA") believed that opinions based on hypothetical questions, where no personal interviews had taken place, were unreliable. However, the Court determined that these conclusions of the APA should not be the basis for a constitutional rule barring an entire category of expert testimony. *Id.* at 899, 77 L. Ed. 2d at 1108. The Court was not persuaded that an opinion not based on a personal interview was entirely unreliable. *Id.* While diagnoses based on live interviews may be more reliable, there is no evidence that opinions based upon extensive research of psychiatric files of a defendant, written evaluations of defendant by other doctors, and interviews with defendant's friends and family are inherently unreliable. N.C.G.S. § 8C-1, Rule 702 provides that a witness qualified as an expert may testify in the form of an opinion if it will assist the trier of fact in understanding the evidence. The rule does not require that an opinion be based on a personal interview. Professor Kenneth Broun notes that an opinion of an expert based upon the opinion of another expert or even upon hearsay may be admissible. 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 188 (4th ed. 1994).

In this case, Dr. White's opinion was based on: (1) her review of the evaluations of other doctors who had interviewed defendant; (2) a personal discussion with a doctor in whose care defendant had been placed; and (3) interviews of defendant's friends, employers, and family. An opinion reached by an expert based on this type of information could assist the jury in understanding the evidence and is not inherently unreliable.

Defendant contends that an expert's opinion that diagnoses a defendant with antisocial personality disorder ("APD") may not be made without a personal interview of the defendant. Yet, the major symptoms of APD are based on behavior, and an evaluation for APD should rely "heavily on historical data from the patient and others." 3 Harold I. Kaplan et al., *Comprehensive Textbook of Psychiatry/III*

2822 (3d ed. 1980). A doctor should delve deeply into a patient's "performance in school, dealings with various school and legal authorities, job performance, and sexual and marital history" to reach a conclusion as to this diagnosis. *Id.* at 2824. In fact, in regard to the specific diagnosis made by Dr. White in this case, psychiatric authority has found that a diagnosis may be made based simply upon historical data and not based on an actual interview with the patient. *Id.* Dr. White did just what has been recommended by psychiatric authority: She talked to defendant's spouse, she found out about defendant's school history through his high-school classmates, she talked to a supervisor about his time in the military, she evaluated his military records, and she talked to an employer about his job performance. Dr. White also reviewed the police reports, the psychiatric evaluations of defendant by Drs. Bolinsky and Tyson, and the psychiatric assessment of defendant done by Dr. Gross. Defendant's own expert admitted that he reviewed records from other psychiatrists to form his opinion. In fact, while defendant's expert did interview defendant for one and a half to two hours, his overall determination of diagnosis may not have been as thorough as that of the State's witness. Defendant's witness did not interview defendant's wife, his military supervisor, or any of defendant's classmates.

Defendant relies on additional authority from the APA and case law from other states which states that, in general, a psychiatric diagnosis made without the benefit of a personal interview is inherently unreliable. Nothing in North Carolina case law or the Rules of Evidence supports such a conclusion, and the United States Supreme Court has chosen not to bar an entire category of expert testimony based on the APA's conclusions. *Barefoot v. Estelle,* 463 U.S. at 899, 77 L. Ed. 2d at 1108. In *Barefoot,* the Supreme Court was addressing the use of hypothetical questions. We conclude that an opinion based upon reviews of evaluations of doctors who had interviewed defendant and personal discussions with doctors in whose care defendant had been placed would be just as reliable as an opinion based on a hypothetical question. In this case, Dr. White spent many hours interviewing many people and discussing defendant's condition with other doctors before she reached her opinion. There can be no question that such an opinion is as reliable as any opinion reached as a result of one hypothetical question, a practice allowed by our Rules of Evidence, N.C. R. Evid. 703 official commentary (1991), and by the United States Supreme Court, *Barefoot v. Estelle,* 463 U.S. 880, 77 L. Ed. 2d 1090.

Any deficiency in Dr. White's evaluation may be adequately revealed by cross-examination. In this case, Dr. Bolinsky was highly critical of Dr. White's failure to conduct a personal examination of defendant in reaching her decision. We believe, as did the Supreme Court in *Barefoot v. Estelle*, that the jury and the procedures of our adversary system are competent to recognize and take account of shortcomings that may be present in psychiatrists' opinions that are not based on personal interviews. *See Barefoot v. Estelle*, 463 U.S. at 899, 77 L. Ed. 2d at 1108.

While it may be better practice to actually interview a defendant before reaching a decision on his mental capacity, a personal interview is not required by our case law, the case law of the United States Supreme Court, or our Rules of Evidence for an opinion of a psychiatrist to be reliable and admissible. We conclude that the trial court did not err in admitting this expert testimony.

[10] Defendant next argues that the trial court erred in instructing on the mitigating circumstance of no significant history of prior criminal conduct. The court instructed the jury as follows:

> First you will consider whether the defendant has no significant history of prior criminal convictions in the last ten years. . . . You would find this mitigating circumstance if you find that the defendant's prior criminal history is the conviction of driving while impaired, communicating threats, and simple assault, and that this was not a significant history of prior criminal activity in the last ten years.

The court also instructed the jury that another mitigating circumstance was that defendant has never been convicted of a felony. As to the felony mitigating circumstance noted, the judge instructed the jury that the evidence was uncontradicted and that the jury should write "yes" in the space provided, indicating that the circumstance was found and deemed mitigating.

We conclude that the jury in this case was correctly instructed on the mitigating circumstance based upon the evidence presented at trial and that any possible prejudice to defendant that may have resulted from the limitation of the instruction was rendered harmless by the peremptory instruction as to the mitigating circumstance that defendant was never convicted of a felony.

Defendant began his sentencing phase presentation by introducing into the record evidence in support of the mitigating circumstance

that "defendant has no significant history of prior criminal convictions *in the last ten years*." (Emphasis added.) Defendant noted that the State and defendant had agreed or stipulated to the following prior convictions "in the last ten years": communicating threats and simple assault, misdemeanor in breaking and entering, and driving while impaired. The State presented no evidence as to this mitigating circumstance.

Defendant bears the burden of establishing that a mitigating circumstance exists. *State v. Brown*, 306 N.C. 151, 178, 293 S.E.2d 569, 586-87, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982). In this case, defendant made no objections to the manner in which this mitigating circumstance was presented to the jury and specifically presented evidence that only supported the submission of the circumstance as it related to the previous ten years.

The Criminal Procedure Act provides that in capital sentencing proceedings, "[i]nstructions determined by the trial judge to be warranted by the evidence shall be given by the court in its charge to the jury prior to its deliberation in determining sentence." N.C.G.S. § 15A-2000(b) (1988). The trial court is not required to instruct on a mitigating circumstance unless substantial evidence supports the circumstance. *State v. Laws*, 325 N.C. 81, 110, 381 S.E.2d 609, 626 (1989), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, 502 U.S.876, 116 L. Ed. 2d 174, *reh'g denied*, 502 U.S. 1001, 116 L. Ed. 2d 648 (1991). In the case of the mitigating circumstance of no significant history of criminal activity, mere record silence as to criminal activity does not substantially support the circumstance. *State v. Gibbs*, 335 N.C. 1, 57, 436 S.E.2d 321, 353 (1993). "[S]ome substantial evidence concerning the defendant's history of prior criminal activity—or lack of it—must be presented to the jury before the trial court may determine as a matter of law that the jury could reasonably find this mitigating circumstance from the evidence." *State v. Laws*, 325 N.C. at 111, 381 S.E.2d at 627.

In *State v. Laws*, defendant assigned as error the fact that the trial court did not submit the mitigating circumstance that the " 'defendant has no significant history of prior criminal activity.' " *Id.* at 110, 381 S.E.2d at 626 (quoting N.C.G.S. § 15A-2000(f)(1) (1988)). We noted that the trial court is not required to instruct upon a statutory mitigating circumstance "unless substantial evidence has been presented to the jury which would support a reasonable finding by

the jury of the existence of the circumstance." *Id.* In *Laws*, we determined that based upon the lack of evidence presented about defendant's criminal history, a jury finding of this circumstance would have been based solely upon speculation and conjecture, not upon substantial evidence, and the submission of the instruction would be unreasonable as a matter of law. *Id.* at 111, 381 S.E.2d at 627.

In *Laws*, we also noted that the trial court had given the jury a peremptory instruction to find as a nonstatutory mitigating circumstance that the defendant had not been previously convicted of a felony involving violence. *Id.* We noted that assuming *arguendo* that it was error not to submit the statutory mitigating circumstance of no significant history of prior criminal activity, the error would be harmless beyond a reasonable doubt "[g]iven the lack of any substantial evidence on the matter of prior criminality of the defendant and the trial court's erroneous peremptory instruction—favorable to the defendant—that the jury must find the non-statutory mitigating circumstance of no prior convictions for violent felonies." *Id.* at 112, 381 S.E.2d at 628. We concluded that the peremptory instruction as to "no prior convictions for violent felonies" provided defendant with "virtually the same benefit" as an instruction on the statutory mitigating circumstance of "no significant history of prior criminal activity." *Id.* at 112-13, 381 S.E.2d at 628.

In this case, the trial court instructed the jury on the mitigating circumstance because it was supported by the evidence, limiting it to the previous ten years as defendant had done when he presented the evidence. Thus, the trial court instructed the jury in the only way supported by the evidence. We find no error in the trial judge's instruction in this regard. Assuming *arguendo*, however, that it was error to limit the mitigating circumstance in the manner done by the trial court, the error was harmless based on the fact that, as in *Laws*, the jury here was also instructed on the mitigating circumstance that defendant had never been convicted of a felony. In regard to this circumstance, the jury was peremptorily instructed to find that it existed and to give the circumstance some value as indicated by the trial court's instruction that "the evidence as to this mitigating circumstance [defendant has never been convicted of a felony] is uncontradicted, and you will find that this circumstance exists and write 'Yes' in the space provided." The jurors had previously been instructed that as to nonstatutory mitigating circumstances, they would only mark "yes" in the space provided if they found that the circumstance existed and that the circumstance had some mitigating value. We con-

clude that the trial court did not err in the submission of this mitigating circumstance.

[11] Next, defendant argues that the trial court erred by instructing the jury that it could refuse to consider nonstatutory mitigating evidence if it deemed that the evidence had no mitigating value. Under this assignment of error, defendant also argues that the trial court failed to instruct that statutory mitigating circumstances were deemed to have mitigating value.

This Court has repeatedly determined that nonstatutory mitigating circumstances do not necessarily have mitigating value. *See State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993); *State v. Huff*, 325 N.C. 1, 59, 381 S.E.2d 635, 669; *State v. Fullwood*, 323 N.C. 371, 397, 373 S.E.2d 518, 533 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602, *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). In *State v. Fullwood*, the Court held that it is "for the jury to determine whether submitted nonstatutory mitigating circumstances have mitigating value." 323 N.C. at 396, 373 S.E.2d at 533. "Although evidence may support the existence of the nonstatutory circumstance, the jury may decide that it [the circumstance] is not mitigating." *Id.* at 397, 373 S.E.2d at 533. "[B]efore the jury 'finds' a nonstatutory mitigating circumstance, it must make two preliminary determinations: (1) that the evidence supports the existence of the circumstance *and* (2) that the circumstance has mitigating value." *State v. Huff*, 325 N.C. at 59, 381 S.E.2d at 669. This proposition has recently been reiterated in *State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (jurors may reject nonstatutory mitigating circumstances if they do not deem them to have mitigating value). We find no reason to alter our previous decisions and conclude that the trial court did not err in its instructions on nonstatutory mitigating circumstances.

[12] Defendant also argues that the trial court erred by not specifically instructing the jury that the statutory mitigating circumstances have mitigating value. The trial court instructed the jurors that if they found a statutory mitigating circumstance to exist, they should mark "yes" in the space provided. Defendant argues that failure to specifically instruct the jury that statutory mitigating circumstances have mitigating value could have resulted in a finding by a juror that a statutory mitigating circumstance did not have mitigating value. Defendant argues that the jurors would have become confused based on the fact that when they were instructed as to nonstatutory mitigating circumstances they were told to determine if the circumstance

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

existed and if the circumstance had mitigating value before marking "yes" in the space provided.

We note that the trial court instructed the jury as to the statutory mitigating circumstances before it gave its instructions as to the nonstatutory circumstances. The trial court described the statutory circumstance and then instructed the jurors that "[i]f one or more of you find by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreperson write 'Yes' in the space provided after this mitigating circumstance on the Issues and Recommendation form." After explaining how to address the three statutory mitigating circumstances, the court explained the nonstatutory mitigating circumstances, instructing that "[i]f one or more of you find by a preponderance of the evidence that any of the following circumstances exist and also deem it to have mitigating value, you would so indicate by having your foreperson write 'Yes' in the space provided." These instructions are in accord with the pattern jury instructions. We conclude that the instructions here were given in accordance with the law and that the jury was able to follow the instructions as they were given. "We presume 'that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' " *State v. Jennings,* 333 N.C. 579, 618, 430 S.E.2d 188, 208 (quoting *Francis v. Franklin,* 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)) (alteration in original), *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 602 (1993). We conclude that the trial court did not err when giving the instructions for statutory and nonstatutory mitigating circumstances.

[13] Defendant next argues that the trial court erred by not intervening during the prosecutors' final arguments. Defendant argues that he was prejudiced by statements of the prosecutor that minimized the jury's sentencing responsibility and that the prosecutor argued that the Bible supported a sentence of death. We note that no objection was made during the prosecutor's closing argument. However, in a capital case, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial.[1]

---

1. Defendant attempted to limit the prosecutor's closing argument by filing a pretrial motion *in limine,* requesting that the prosecutor be foreclosed from making any argument that implies that the jury's verdict of the death penalty would not be real, would not be carried out, or is subject to further review, and to limit any argument in favor of the death penalty for any reasons not specifically listed as aggravating circumstances in N.C.G.S. § 15A-2000(e). There is no evidence in the record or transcript that the trial court ever ruled on the motion *in limine* or that it was even discussed at

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

In order to prevail under such an argument, however, "the impropriety of the argument must be gross indeed," *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979), such that this Court would "hold that a trial judge abused his discretion in not recognizing and correcting [the argument] *ex mero motu*," *id.* In order to constitute such an abuse of discretion, the prosecutor's comments must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986) (quoting *Donnelly v. Christoforo*, 416 U.S. 637, 40 L. Ed. 2d 431 (1974)).

Defendant argues that two separate portions of the prosecutor's closing argument were erroneous. First, defendant argues that the prosecutor erroneously diminished the jury's responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231 (1985), by arguing:

> You have heard Judge Fulton explain the details of this case to you yesterday before the guilt phase was over; you heard it during the voir dire about the procedure; you were very well educated in how this works. But there is always some reluctance. To say that this is not so is to say that the citizens are making a recommendation that someone die, and they are not. Some people, when they sit on a jury, think or tell the lawyers, "Who am I to decide whether someone lives or dies?" That subject can come up in any atmosphere, and particularly in the courtroom, and I want to address it directly.
>
> If you are going to follow the law, and we know you will, you are not making that decision. You are saying that the factors that we have found outweigh—aggravating factors we have found—outweigh the mitigating factors. You're saying yes. You're saying

any time during trial, and defendant does not make an assignment of error based on this failure of the trial court. N.C. R. App. P. 10(b)(1) states that

> [i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. *It is also necessary for the complaining party to obtain a ruling upon the party's request, objection or motion.*

N.C. R. App. P. 10(b)(1) (emphasis added). In light of defendant's failure to satisfy the requirements of the rule to preserve assignments of error, we find that this assignment of error was not correctly preserved for appeal. *See State v. Wilson*, 289 N.C. 531, 537, 223 S.E.2d 311, 314 (1976) (it is not enough to preserve an issue for appellate review by merely filing a pretrial motion to suppress evidence).

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

that this case is sufficiently substantial to warrant the death penalty. You're saying yes. And your job is over, and the Court will sentence the defendant. That is what you are doing. You are not making a personal moral decision. You are not debating the death penalty. You are not taking out a vendetta. You're not bringing politics into this court. You're following the law. . . .

. . . When you came through that door, you knew you would be hearing the words you're hearing now. You know [sic] that the prosecutor would look right at you and say, "We're asking you to recommend death." The lives that you live, the jobs that you hold or held at one time, or the occupations you're in now, you must think your way through these things. Who am I to decide is almost like who am I to live. You all are living by your own hands and your own minds. We ask not for your heart in this case. We ask for your minds to follow the law, and we know you will.

In reviewing the remarks at issue in this case, we consider the context in which the remarks were made and the overall factual circumstances to which they referred. We also note that trial counsel are allowed wide latitude in jury arguments. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). Additionally, the prosecutor has a duty to strenuously present the State's case and " 'use every legitimate means to bring about a just conviction.' " *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980) (quoting *State v. Monk*, 286 N.C. 509, 515, 212 S.E.2d 125, 130 (1975)). In a capital case, that duty may be extended to present arguments for the sentence of death. N.C.G.S. § 15A-2000(a)(4) (1988).

In *State v. Green*, 336 N.C. 142, 187, 443 S.E.2d 14, 40 (1994), we addressed the question of whether the following statement diminished the jury's responsiblity and constituted prejudicial error: "The form tells you, from your answers, whether he should be sentenced to life or death. You're not deciding on the sentence. You're deciding on the factors and you're weighing the factors." We found that the statements did not constitute prejudicial error. We conclude that the statements made here also did not constitute prejudicial error when the closing argument is viewed in its entirety. The prosecutor's statement that "the Court will sentence the defendant" is a correct statement of law under N.C.G.S. § 15A-2002, which states that the "judge shall impose a sentence." The statement, "If you are going to follow the law, . . . you are not making that decision [of death]," is presented in the same vein as the statement in *Green*, that "[y]ou're not deciding

on the sentence." Viewing the statements in context, the prosecutor was telling the jury that its job was to weigh the aggravating and mitigating circumstances and to determine if the aggravating circumstances outweighed the mitigating circumstances. If it did, then the jury would answer "yes," which would mean that the case is sufficiently substantial to impose the death penalty. This is also a correct statement of the law under N.C.G.S. § 15A-2000(b) (1988). We conclude that the overall context of the prosecutor's statements emphasized that if the jurors recommended death, that was tantamount to saying that the aggravating circumstances found were sufficient to warrant the imposition of the death penalty and that it would be the judge who would impose the ultimate sentence. But the jurors should not think of the sentence as "taking out a vendetta" or "bringing politics into [the] court"—they were simply "following the law." Any impropriety of the statements was not so gross that the trial court should have intervened *ex mero motu*.

**[14]** Defendant also objects to the portions of the prosecutor's argument referring to the Bible. The prosecutor began her argument with numerous references to the Bible, stating that she believed that defendant was also going to quote from the Bible. The prosecutor quoted from passages that stated that he who kills is a murderer and shall be put to death. The prosecutor quoted a passage from the New Testament which stated that "[w]hoever then relaxes one of the least of these commandments and teaches men to do so, shall be called the least in the kingdom of heaven." This quote was made to stress that the New Testament, which the defendant might quote to emphasize forgiveness and "turning the other cheek," also stated that the commandments of God should still be followed. Finally, the prosecutor also quoted from a passage in Romans which stated that "there is no authority except from God, and those that exist have been instituted by God. Therefore, he who resists the authorities resists what God has appointed, and those who resist will incur judgment, for rulers are not a terror to good conduct, but to bad."

We note that "more often than not" this Court has found biblical arguments to fall within permissible margins given counsel in arguing "hotly contested cases." *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500; *see also State v. Gibbs*, 335 N.C. 1, 69-70, 436 S.E.2d 321, 361; *State v. Hunt*, 323 N.C. 407, 427, 373 S.E.2d 400, 413 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 330 N.C. 501, 411 S.E.2d 806, *cert. denied*, —— U.S. ——, 120 L. Ed. 2d 913 (1992); *State v. Brown*, 320 N.C. 179, 206, 358 S.E.2d 1,

19, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987); *State v. Oliver*, 309 N.C. 326, 359-60, 307 S.E.2d 304, 326 (1983). A review of the passages quoted by the prosecutor convinces us that the biblical references made here were not so grossly improper as to require the trial court's intervention *ex mero motu*.

We have previously held that the use of these passages or similar passages was not grossly improper. In *Artis*, 325 N.C. at 330, 384 S.E.2d at 499, the prosecutor quoted the passage noting that a murderer shall be put to death. Also in *Artis*, 325 N.C. at 330, 384 S.E.2d at 500, the prosecutor, in an attempt to rebut any defense counsel argument that the New Testament teaches forgiveness, argued that earlier biblical passages remain unaffected by the New Testament. This Court found that these arguments were not so improper as to require intervention by the trial court *ex mero motu*. In *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), we held that a quote stating in part that "there is no power but of God" was not so improper as to require a trial court's intervention *ex mero motu. Id.* at 268, 357 S.E.2d at 920.

In determining the error in a prosecutor's reference to the Bible, we have additionally considered if defense counsel also discussed passages from the Bible. In *State v. Oliver*, we noted that defense counsel had, as anticipated by the prosecutor, argued that the New Testament teaches forgiveness and mercy. 309 N.C. at 360, 307 S.E.2d at 326. In such a situation, we found nothing in the prosecutor's biblical references that amounted to plain error and justified reversal. In this case, the defense counsel, as predicted by the prosecutor, also quoted from the Bible, noting that the Bible states: "I set before you this day life and death. Choose life." Defense counsel also stated that the Bible says: "You shall not do injustice in judgment. You shall stand forth against the life of your brother. I am the Lord. You shall not take vengeance or bear any grudge against the sons of your people. You shall love your neighbor as yourself. I am the Lord."

In light of our perceived lack of prejudice and in light of defense counsel's use of the Bible in his closing argument, we conclude that the statements made by the prosecutor were not so grossly improper as to require intervention of the trial court *ex mero motu*.

[15] Defendant next argues that the trial court erred in submitting the aggravating circumstance that the killing was committed for pecuniary gain. Defendant argues that the evidence was insufficient

to support this circumstance. We disagree. The trial court instructed the jury as to this aggravating circumstance as follows:

> A murder is committed for pecuniary gain if the defendant, when he commits it, has obtained or intends to or expects to obtain money or some other thing which can be valued as money, either as compensation for committing it or as a result of the death of the victim. If you find from the evidence, beyond a reasonable doubt, that when the defendant killed the victim, the defendant intended to or expected to obtain money from the victim, you would find this aggravating circumstance . . . .

The evidence showed that defendant had confessed that he intended to and did ask the victim for money. When she did not give it to him, he killed her and then took money from the victim's purse. This evidence is sufficient to support a finding of the pecuniary gain aggravating circumstance. *See State v. Hunt*, 323 N.C. at 432, 373 S.E.2d at 416; *State v. Jerrett*, 309 N.C. 239, 269, 307 S.E.2d 339, 355 (1983) (evidence that defendant took money, gun shells/cartridges, and a car after shooting the victim was "plenary evidence to support a finding that the murder was committed for pecuniary gain").

[16] Next, defendant argues that the trial court erred by instructing the jury that each juror "may" consider mitigating circumstances that juror found to exist when weighing the aggravating and mitigating circumstances. Specifically, the trial judge instructed the jury:

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, each juror *may* consider any mitigating circumstance or circumstances that the juror deems to exist by a preponderance of the evidence in Issue No. Two.

(Emphasis added).

The defendant contends that this instruction violated the Eighth and Fourteenth Amendments and principles set forth in *Penry v. Lynaugh*, 492 U.S. 302, 318, 106 L. Ed. 2d 256, 277 (1989), and *Eddings v. Oklahoma*, 455 U.S. 104, 114, 71 L. Ed. 2d 1, 11 (1982), which held that the sentencer in a capital case may not refuse to consider any relevant mitigating evidence offered by the defendant as basis for a sentence less than death. Defendant seems to argue that the use of the word "may" allowed some jurors to disregard found relevant mitigating evidence.

STATE v. DANIELS

[337 N.C. 243 (1994)]

We have recently reviewed the exact instruction challenged here and found it to be without error. *State v. Lee*, 335 N.C. 244, 287, 439 S.E.2d 547, 569 (1994). Specifically, we held in *Lee* that these pattern jury instructions would be interpreted by any reasonable juror to mean that all mitigating circumstances found by that juror to exist and have mitigating value must be considered. *Id.* at 287, 439 S.E.2d at 570. The instructions specifically state that the evidence in aggravation must be weighed against the evidence in mitigation. We continue to believe that the pattern jury instructions as given here are correct. *See State v. Green*, 336 N.C. at 175, 443 S.E.2d at 33-34. Thus, this assignment of error is without merit and is overruled.

[17] Defendant also argues that the North Carolina death penalty statute is unconstitutional. Specifically, he argues that the statute is unconstitutional because the heinous, atrocious, or cruel aggravating circumstance is vague and arbitrary. We have consistently held against defendant on this issue and have specifically upheld the constitutionality of the heinous, atrocious, or cruel aggravating circumstance in *State v. Syriani*, 333 N.C. 350, 391-92, 428 S.E.2d 118, 141, *cert. denied*, —— U.S. ——, 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. ——, 126 L. Ed. 2d 707 (1994). We conclude that because the trial court specifically instructed the jury pursuant to the North Carolina pattern jury instructions, which incorporate a narrowing definition adopted by this Court and expressly approved by the United States Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 255, 49 L. Ed. 2d 913, 924 (1976), there is no merit to defendant's argument.

### PROPORTIONALITY

[18] Finding no error in either the guilt-innocence phase or the capital sentencing proceeding, it is now the duty of this Court to review the record and determine (1) whether the record supports the jury's finding of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988).

The following aggravating circumstances were submitted to the jury:

(1) The capital felony was committed for pecuniary gain.

. . . .

(2 The capital felony was especially heinous, atrocious, or cruel.

. . . .

(3) The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

The jury responded "yes" to each of these inquiries, thus finding these aggravating circumstances to exist.

As noted above, we have already concluded that the aggravating circumstance that the murder was committed for pecuniary gain was supported by the evidence. Upon conducting a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel, we conclude that the jury's finding of the other two aggravating circumstances was also supported by the evidence. We further conclude, based upon this thorough review, that the jury did not sentence the defendant to death while under the influence of passion, prejudice, or any other arbitrary factor.

Our final duty is to determine whether the punishment of death in this case is proportionate to other cases in which we have affirmed the death penalty. N.C.G.S. § 15A-2000(d)(2) (1988).

As this Court has frequently noted, the purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review is necessary to serve "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306; 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). In conducting proportionality review, we "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown,* 315 N.C. 40, 70, 337 S.E.2d 808, 829 (1985), *cert. denied,* 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988).

In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly sim-

ilar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition.

*State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). ·

We begin our analysis by comparing the instant case with those seven cases in which this Court has determined that the sentence of death was disproportionate: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373; *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

In *State v. Benson,* the defendant was convicted of first-degree murder based solely upon the theory of felony murder; the victim died of a cardiac arrest after being robbed and shot in the legs by the defendant. The only aggravating circumstance found by the jury was that the crime was committed for pecuniary gain. This Court determined that the death sentence was disproportionate based in part on the fact that it appeared defendant was simply attempting to rob the victim, as he fired at the victim's legs and not a more vital portion of the body. 323 N.C. at 329, 372 S.E.2d at 523. In addition, defendant Benson "pleaded guilty during the trial and acknowledged his wrongdoing before the jury." *Id.* at 328, 372 S.E.2d at 523.

In *State v. Stokes,* the defendant was one of four individuals who was involved in the beating death of a robbery victim. Defendant was found guilty of first-degree murder under the theory of felony murder, and only one aggravating circumstance was found, that the crime was especially heinous, atrocious, or cruel. The Court, in finding that the death sentence was disproportionate, noted that none of the defendant's accomplices were sentenced to death, although they "committed the same crime in the same manner." 319 N.C. at 27, 352 S.E.2d at 664.

In *State v. Rogers,* the defendant was convicted of first-degree murder based on a shooting of the victim in a parking lot during an argument. Only one aggravating circumstance was found, that "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence

against another person or persons." 316 N.C. at 234, 341 S.E.2d at 731. The Court found that this seemingly senseless shooting simply did "not contain the viciousness and the cruelty present" in other death cases that involved only the "course of conduct" aggravating circumstance. *Id.* at 236, 341 S.E.2d at 733.

In *State v. Young*, the Court noted that in armed robbery cases where death is imposed, the jury has found the aggravating circumstance that the defendant was engaged in a course of conduct that included the commission of violence against another person and/or that the crime was especially heinous, atrocious, or cruel. 312 N.C. at 691, 325 S.E.2d at 194. Neither of these circumstances was found by the jury in *Young*. The especially heinous, atrocious, or cruel circumstance was submitted and rejected by the jury. *Id.*

In *State v. Hill*, the defendant shot a police officer while engaged in a struggle near defendant's automobile. This Court found the death sentence disproportionate:

Given the somewhat speculative nature of the evidence surrounding the murder here, the apparent lack of motive, the apparent absence of any simultaneous offenses, and the incredibly short amount of time involved, together with the jury's finding of three mitigating circumstances tending to show defendant's lack of past criminal activity and his being gainfully employed, and the unqualified cooperation of defendant during the investigation . . . .

311 N.C. at 479, 319 S.E.2d at 172.

In *State v. Bondurant*, the defendant shot his victim after defendant had spent the night drinking; there was no motive for the killing, and immediately after the victim was shot defendant made sure the victim was taken to the hospital. Defendant himself entered the hospital to seek medical assistance for the victim. 309 N.C. at 694, 309 S.E.2d at 182-83.

In *State v. Jackson*, the victim had been shot in the head two times at close range. The defendant had earlier flagged down the victim's car, telling his companions that he intended to rob the victim. The defendant was convicted of murder in the first degree, kidnapping, and robbery with a dangerous weapon and was sentenced to death. This Court found the evidence insufficient to support the kidnapping and robbery with a dangerous weapon convictions and found the death sentence disproportionate because there was "no evidence

of what occurred after defendant left with McAulay [the victim]." 309 N.C. at 46, 305 S.E.2d at 717.

We conclude that this case is not similar to any of the above cases, where death was found to be a disproportionate sentence. Defendant in this case entered the home of his aunt asking for money; when she would not give him any money and threatened to call his mother, defendant proceeded to strike his aunt numerous times and then strangled her with a cord he wrapped around her neck three times. He finally dragged the body down the hall, making sure not to leave any fingerprints on the body. After killing her, defendant left his aunt's home; he proceeded to spend the money he stole to buy cocaine. He then went to his house, smoked some cocaine, and proceeded to brutally and viciously beat his wife and son with a hammer. He did not attempt to get medical attention for any of his victims.

In reviewing the proportionality of a sentence, it is also appropriate for us to compare the case before us to other cases in the pool used for proportionality review. *Lawson*, 310 N.C. at 648, 314 S.E.2d at 503. While we "will not undertake to discuss or cite all of those cases" we have reviewed, *State v. McCollum*, 334 N.C. 208, 244, 433 S.E. 2d 144, 164 (1993), the "Bar may safely assume that we are aware of our own opinions filed in capital cases arising since the effective date of our capital punishment statute, 1 June 1977," *State v. Williams*, 308 N.C. 47, 82, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). In examining the pool, we review cases with similar facts and with similar aggravators and mitigators.

Here, defendant was convicted of first-degree murder on the theories of premeditation and deliberation and of felony murder. In addition, the jury found the three submitted aggravating circumstances existed in this case: the murder was especially heinous, atrocious, or cruel; it was committed for pecuniary gain; and it was part of a course of conduct that included crimes of violence to others. The jury also found eleven of the fourteen submitted mitigating circumstances to exist. The mitigating circumstances found were: defendant has no significant history of prior criminal convictions in the last ten years; the capital felony was committed while the defendant was under the influence of mental or emotional disturbance; the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; immediately after defendant's arrest in unrelated charges, he confessed to the murder

charge; defendant had a long history of alcohol and drug dependency; defendant's two suicide attempts were a direct result of realizing what he had done; defendant has the potential for rehabilitation with proper psychological treatment and restraint from drugs and alcohol; defendant has been able to conform to jail life without exhibiting aggressive behavior; defendant is peaceful and quiet when he is without the use of drugs and alcohol; defendant willingly cooperated with the police concerning the location of the victim's body, how to gain entry into the house, and the location of the victim's wallet; and defendant has never been convicted of a felony. The jury did not find that defendant had shown remorse; that he had suffered mental and verbal abuse, alienation of affection, and lived as the scapegoat of the family problems in the environment in which he lived; or the catchall mitigator.

In reviewing the cases in the pool, we have found several where the jury has returned a sentence of death in a robbery-murder case involving a course of conduct that included crimes of violence to others. In *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985), the jury recommended a sentence of death, and we found the sentence proportionate. In *Gardner*, the defendant killed two people in a restaurant. Two aggravators were found: that the murder was committed for pecuniary gain and that the murder was part of a course of conduct that included the commission by the defendant of another crime of violence against another person. Both of these circumstances were found by the jury in this case.

In *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740, *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983), the jury sentenced both defendants to death after finding the same three aggravators as exist in this case. The facts of that case were also similar in that the case involved the severe beating of one victim who was not killed but who had his wallet stolen and the stabbing and resulting death of a second victim who was killed after she told the defendants she had no money to give them when they demanded it. *Id.* at 464, 302 S.E.2d at 751. Defendants took the victim's pocketbook from her after they killed her. *Id.*

In the case of *State v. McDougall*, 308 N.C. 1, 301 S.E.2d 308, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983), the defendant was not committing murder for pecuniary gain; however, the murder was part of a course of conduct that included the commission by the defendant of another crime of violence against another person, and it was

determined that the murder was especially heinous, atrocious, or cruel. In addition, the jury found the mitigators that the defendant was acting under a mental or emotional disturbance and that defendant did not have the capacity to appreciate the criminality of his conduct. Nevertheless, the jury still recommended a sentence of death, and we found the sentence to be proportionate. *Id.* at 38, 301 S.E.2d at 330. As noted earlier, the two aggravating circumstances present in *McDougall* are present in this case; additionally, the two statutory mitigators found by the jury in *McDougall* were also found by the jury in this case.

We have also reviewed other first-degree murder cases where the jury has found the defendant guilty under premeditation and deliberation as well as felony murder based upon robbery. We found that while many of the robbery-murder cases resulted in life sentences, most of those cases did not involve the infliction of violence on a person other than the murder victim during the course of the crime.

Our review of the cases in the pool convinces us that the sentence here was not disproportionate.

Finally, we note that "[e]arly in the process of developing our methods for proportionality review, we indicated that similarity of cases, no matter how many factors are compared," is not " 'the last word on the subject of proportionality' " but merely serves as an initial point of inquiry. *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 46-47 (quoting *Williams*, 308 N.C. at 80-81, 301 S.E.2d at 356). The issue of whether the death penalty is proportionate in a particular case must rest in part on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances. *Id.* Based upon our review of the cases in the pool and the experienced judgment of members of this Court, we hold that the sentence of death in this case is not disproportionate and decline to set aside the death penalty imposed.

In summary, we have carefully reviewed the transcript of the trial and sentencing proceeding as well as the record and briefs and oral arguments of counsel. We have addressed all of defendant's assignments of error and conclude that defendant received a fair trial and a fair sentencing proceeding free of prejudicial error before an impartial judge and jury. The conviction and the aggravating circumstances are fully supported by the evidence. The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and is not disproportionate.

**[19]** Finally, we note that we have discovered an error in the judgment entered for the assault convictions. Defendant was indicted for the felony of assault with a deadly weapon inflicting serious injury upon his son in indictment number 90CRS4586. The jury found defendant guilty of the lesser charge of assault with a deadly weapon upon his son, which is a misdemeanor. However, the judgment and commitment sheet indicates that the trial judge sentenced defendant on the basis that he had been convicted of the felony of assault with a deadly weapon inflicting serious injury. Even though defendant's convictions for assault were consolidated, we believe the misapprehension under which the judge seems to have sentenced defendant may have affected defendant's sentence. We therefore believe that defendant is entitled to a new sentencing in regard to the three assault convictions.

Defendant was also convicted of attempting to burn a dwelling house. Although he gave notice of appeal of this conviction, defendant does not bring forward any assignments of error or make any argument with respect to it in his brief. We find no error in this conviction.

NO. 90CRS4580, FIRST-DEGREE MURDER: NO ERROR.

NO. 90CRS4582, ASSAULT WITH A DEADLY WEAPON WITH INTENT TO KILL INFLICTING SERIOUS INJURY: NO ERROR IN CONVICTION; REMANDED FOR RESENTENCING.

NO. 90CRS4586, ASSAULT WITH A DEADLY WEAPON: NO ERROR IN CONVICTION; REMANDED FOR RESENTENCING.

NO. 90CRS4587, ASSAULT WITH A DEADLY WEAPON: NO ERROR IN CONVICTION; REMANDED FOR RESENTENCING.

NO. 90CRS4590, ATTEMPTING TO BURN DWELLING HOUSE: NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.

Chief Justice EXUM concurring in part and dissenting in part.

I concur with the majority in rejecting defendant's assignments of error relating to the guilt phase of his trial. I cannot agree, however,

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

with the majority's conclusion that the trial court did not err in admitting the testimony of Dr. White at the sentencing proceeding. I believe this error warrants a new sentencing proceeding.

Since the majority opinion fails to recite thoroughly the evidence presented at the sentencing proceeding I shall summarize that evidence here.

The State's evidence consisted primarily of the testimony of Dr. Cynthia Bernice White, an expert in psychiatry. Through her testimony the State sought to establish that defendant was an aggressive, unremorseful person who was hostile toward society and whose condition was untreatable.

Dr. White diagnosed Daniels as suffering from antisocial personality disorder (APD).[1] She described those with APD as having a "careless disregard for normal social norms" and "poor impulse control," causing them to behave in an "irritable" and "aggressive" manner. When they inflict harm on others, they feel justified and lack remorse for their actions. Treatment for those with APD is generally ineffective.

Dr. White conceded that she diagnosed Daniels without the benefit of a personal interview or any observations of him. Her diagnosis of Daniels was based in large part on his actions on the day of the offenses as reflected in the police report. From the statement in Daniels' confession "I killed my aunt," for example, she concluded that Daniels lacked remorse and felt justified in his actions. Dr. White determined that Daniels' remaining in his burning house and tying the drawstring around his neck were "suicide gestures," or "apparent attempts" to take his life by means which were not in fact life threatening. She said persons with APD make suicide gestures to "manipulate their environment" and to "gain sympathy." She characterized Daniels' letter to the Governor as a "cunning" maneuver by someone who felt justified in his actions and who lacked remorse; she also described it as "grandstanding." Dr. White's conclusion that Daniels suffered from APD was based on these characterizations which she made of Daniels' behavior.

---

1. As a leading text describes APD: "In common use, 'antisocial personality' has been used interchangeably with the term 'sociopath' or 'psychopath.' " 3 Harold I. Kaplan et al., Comprehensive Textbook of Psychiatry/III 2817 (3d ed. 1980). Those with this affliction "behave in a manner that is completely out of keeping with their society's standards." *Id. See also* Leland E. Hensie & Robert J. Campbell, Psychiatric Dictionary 48 (4th ed. 1970).

Dr. White also testified that Daniels was not mentally impaired at the time of the murder despite his use of drugs that day. On the basis of Daniels' confession and other reports, Dr. White concluded that Daniels was a chronic drug abuser. This chronic abuse made Daniels tolerant of the effects of the drugs he had abused over several years. He was, therefore, in her opinion, tolerant of the effects of alcohol such that he would have been aware of his levels of aggression and violence at and beyond the time of its consumption.[2]

Defendant's psychiatric evidence portrayed him quite differently than the testimony of Dr. White. It tended to show that he was not depraved but rather depressed, that he was mentally impaired at the time of the crimes due to his consumption of alcohol and cocaine, and that his prospects for rehabilitation were favorable.

Defendant introduced the testimony of Dr. John Bolinsky, an expert in psychiatry, who had testified earlier in the guilt phase. His opinions were based on personal interviews and examinations of defendant, defendant's statements to officers after his arrest, conversations with Dr. Tyson, and the mental health records from Dorothea Dix Hospital, Black Mountain Alcohol Rehabilitation Center, and Randolph Clinic.

Dr. Bolinsky's opinion was that Daniels suffered from chronic depression and chronic substance abuse; he did not suffer from APD. His diagnosis of chronic depression was based on his mental status examination[3] of Daniels, which was consistent with depression and tended to negate APD. It was also based on Daniels' past suicide incidents involving an attempted shooting and the ingestion of

2. Cross-examination revealed that Dr. White's opinion about Daniels' mental state at the time of the murder was based on a report that Daniels had consumed a fifth of wine. When informed that Daniels had also used beer and cocaine, she stated her opinion would remain the same due to Daniels' tolerance of those substances.

3. Although the transcript does not elaborate on a "mental status" examination, a leading psychiatric text states that a mental status examination is designed to "classify and describe all the areas and components of mental functioning that are involved in modern diagnostic classifications." 1 Kaplan et al., Comprehensive Textbook of Psychiatry/III 912 (3d ed. 1980). This examination requires that the examiner observe and note the following characteristics: appearance, psychomotor activity, attitude, speech, mood, perception, thought process, consciousness, orientation, memory, judgment, insight and reliability. Id. at 916-19. Another source states: "At a minimum, each [psychiatric] examination should include [an evaluation of the following:] general behavior, attitude toward examiner, cooperativeness; brightness; restlessness; coherence; mood; sense of remorse, guilt, recrimination or shame; and personality." Henry A. Stone, Forensic Psychiatry 43-44 (2d ed. 1965).

kerosene, which were revealed through the personal interview. He said chronic depression is treatable.

Dr. Bolinsky also testified that Daniels' use of alcohol and cocaine on the day of the offenses impaired his capacity to plan his behavior. He explained that based in part on his interview with Daniels, Daniels' substance abuse was not the chronic daily type which leads to increased tolerance levels. Instead, since Daniels' use was marked by days or weeks of sobriety followed by a binge on drugs and alcohol, Daniels' abuse was the chronic episodic type, which does not lead to tolerance. Thus, Daniels' use of alcohol and cocaine on the day of the offenses would have caused him to be mentally impaired.

Dr. Bolinsky testified that based on his interview with Daniels and on his review of Daniels' records, it is improbable that Daniels would have killed his aunt absent his chronic depression, chronic substance abuse and acute substance abuse on the day of the homicide. Dr. Bolinsky also concluded that Daniels felt remorse for his actions, expressly contesting Dr. White's testimony to the contrary. In support of his conclusion Dr. Bolinsky referred to Daniels' letter to the Governor and his statements following his arrest, which he interpreted as showing remorse.

Turning to the legal issue which is the subject of this dissent, it must first be noted that the majority opinion focuses primarily on aspects of Dr. White's opinion which are not at issue. The issue is not whether an expert may rely in part on the statements of others, which we addressed in *State v. Smith*, 315 N.C. 71, 337 S.E.2d 833 (1985), or whether reliance on a certain item of evidence is reasonable, which we addressed in *State v. Bright*, 301 N.C. 243, 271 S.E.2d 368 (1980), or whether an expert may criticize the techniques of another expert, which we addressed in *State v. Bonney*, 329 N.C. 61, 405 S.E.2d 145 (1991), or whether it is an unconstitutional violation of due process to permit an expert to testify about a defendant's mental condition without having personally examined him, which the Supreme Court addressed in *Barefoot v. Estelle*, 463 U.S. 880, 77 L. Ed. 2d 1090 (1983).

The issue before us is whether under this State's evidentiary rules it was error for the trial court to permit Dr. White to testify as to defendant's mental condition without having personally examined him. Although wholly absent from the majority opinion, the principle around which this inquiry revolves is that "opinion testimony based

on inadequate data should be excluded." *State v. Rogers*, 323 N.C. 658, 664-65, 374 S.E.2d 852, 856 (1989). Expert opinion not supported by a sufficient foundation is inadmissible under Rule 702 since it will not "assist the trier of fact." *State v. Clark*, 324 N.C. 146, 160, 377 S.E.2d 54, 62 (1989). This principle is implicit in Rule 703, 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 188 n.303 (4th ed. 1993), and is espoused by numerous pre-Rules cases not inconsistent with Rules 702 and 703. *Donavant v. Hudspeth*, 318 N.C. 1, 24, 347 S.E.2d 797, 811 (1986); *Service Co. v. Sales Co.*, 259 N.C. 400, 411, 131 S.E.2d 9, 18 (1963); *Branch v. Dempsey*, 265 N.C. 733, 747, 145 S.E.2d 395, 405 (1965).

Thus, an expert opinion may be inadmissible due to the inadequacy of its foundation even though the individual components of that foundation are not themselves improper under Rule 702. The issue is, therefore, whether Dr. White had an adequate foundation on which to base her differential diagnosis that defendant suffered from APD and whether Dr. White had an adequate foundation on which to base her opinion that defendant was not affected by his alcohol and cocaine abuse on the day of the offense.

In deciding whether Dr. White's foundation was adequate it bears emphasis that this Court's expertise rests in matters of law. As to subjects that are beyond our training and experience, such as psychiatry and psychology, we must give considerable weight to the recognized authorities in the relevant field. On the issue before us the authorities are unanimous that absent a personal interview and examination, the differential diagnosis of a mental health expert as to an individual's mental condition is unreliable and should be excluded.

The American Psychiatric Association has explained:

Absent an in-depth examination and evaluation, the psychiatrist cannot exclude alternative diagnoses; nor can he assure that the necessary criteria for making the diagnosis in question are met. As a result, he is unable to render a medical opinion with a reasonable degree of certainty.

Amicus Curiae Brief for the American Psychiatric Association at 9, 25, *Barefoot v. Estelle*, 463 U.S. 880, 77 L. Ed. 2d 1090 (1983) (quoted in American Bar Association, Criminal Justice Mental Health Standards § 7-3.11, at 137 n.12). Indeed, the American Psychiatric Association has taken the following position:

On occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention, or who has disclosed information about himself/herself through public media. It is unethical for a psychiatrist to offer a professional opinion unless he/she has conducted an examination and has been granted proper authorization for such a statement.

American Psychiatric Association, Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry § 7, annot. 3 (1985).

The American Bar Association Criminal Justice Mental Health Standards reflect this same distrust of a mental health diagnosis not based on a personal interview:

[N]o witness should be qualified by the court to present expert testimony of a person's mental condition unless the court determines that the witness . . . has performed an adequate evaluation, including a personal interview with the individual whose mental condition is in question, relevant to the legal and clinical matter[s] upon which the witness is being called to testify.

American Bar Association, Criminal Justice Mental Health Standards § 7-3.11(a)(iii) (1989).

The concerns voiced by these authorities are supported by at least one study which indicates that diagnoses based on live interviews are significantly more reliable than those based on case summaries. Steven E. Hyler et al., *Reliability in the DSM-III Field Trials*, 39 Archives Gen. Psychiatry 1275, 1276 (1982) (reliability of diagnoses based on personal interview was "extremely good"; reliability of diagnoses based on case summaries was "only fair").

Legal authorities in this area also admonish the practice of diagnosing an individual's mental health without the benefit of a personal interview on the ground that such a diagnosis is inherently unreliable. *See* McCormick on Evidence § 44 (4th ed. 1992); Gerald Bennett, A Guided Tour Through Selected ABA Standards Relating to Incompetence to Stand Trial, 53 Geo. Wash. L. Rev. 375, 400 (1985); Note, Psychiatric Evaluation of Abnormal Witnesses, 59 Yale L. J. 1324, 1331-32 (1950). \

Thus, the authorities on diagnosing mental afflictions which we should heed are of one accord that a diagnosis not based on a personal interview and examination is unreliable and should be excluded from evidence in a court of law.

STATE v. DANIELS

[337 N.C. 243 (1994)]

This Court has likewise recognized the integral value of a personal examination to a reliable psychiatric diagnosis. We said in *State v. Wade*, 296 N.C. 454, 463, 251 S.E.2d 407, 412 (1979):

The assertion of *State v. Alexander*, [179 N.C. 759, 765, 103 S.E. 383, 386 (1920)] that "[c]onversation with one alleged to be insane is, of course, one of the best evidences of the present state of his mind" is still true. Conversation, and its interpretation and analysis by a trained professional, is undoubtedly superior to any other method the courts have for gaining access to an allegedly insane defendant's mind. When it is conducted with the professional safeguards present here, it provides a sufficient basis for the introduction of an expert diagnosis into evidence.

In addition to the authorities cited above, which seriously impugn the reliability of a diagnosis by a mental health expert who has not personally examined his patient, this Court must also consider the particular facts of the case before us. These facts, like the authorities cited above, all indicate that the testimony of Dr. White was unreliable and should have been excluded.

Dr. Bolinsky testified quite explicitly that because of Daniels' peculiar symptoms and the possible diagnoses which they afforded, a reliable differential diagnosis could not be made in the absence of a personal interview and examination. More specifically, without such a personal assessment of Daniels, a differential diagnosis that he suffered from APD as opposed to depression would be inherently unreliable. A personal mental status examination of Daniels would have revealed an abnormal mental status, which, in turn, would have tended to negate a diagnosis of APD, and would have been consistent with depression.[4] Also, Dr. White's conclusions were made without the benefit of critical facts, such as Daniels' episodic substance abuse and quite likely his previous suicide attempts, which defendant revealed to Dr. Bolinsky in his interview; these facts would have been revealed through a personal examination and might have caused her to make the same diagnosis as Dr. Bolinsky.

Dr. Bolinsky's testimony in this respect is echoed in a leading text on psychiatry, which states that a mental status examination is necessary to a diagnosis of APD in order to rule out other disorders.

4. Dr. White, in her testimony, agreed that "persons with antisocial personality disorders have a normal mental status exam . . . ." *See also* 3 Kaplan et al., Comprehensive Textbook of Psychiatry/III 2816, 2824 (3d ed. 1980) (normal mental status is an "associated feature" of APD); *accord* Diagnostic and Statistical Manual of Mental Disorders 343 (3d ed. 1987).

3 Harold I. Kaplan et al., Comprehensive Textbook of Psychiatry/III 2824 (3d ed. 1980) [hereinafter Kaplan]. Kaplan states:

> Isolated or even repeated episodes of violence or criminal behavior unrelated to the other descriptive diagnostic behaviors [associated with APD] should be described as such and, unless the other behaviors are present, should not be labeled antisocial behavior. In the past, with DSM-II, there was a tendency to place unlikable people or unproductive people into this diagnostic category, and its use as a pejorative label has been frequent.

*Id.*

Dr. Bolinsky's testimony regarding the need to examine Daniels for depression is likewise supported in Kaplan, which states that "[d]epression is one of the most common illnesses to which humans are subject. Paradoxically, it is probably one of the most frequently overlooked [illnesses.]" 1 Kaplan at 1019. "A complete psychiatric examination should be obtained in each case" where a patient may suffer from depression. *Id.* at 1327. Such a differential diagnosis for depression is especially necessary where there is a history of suicide attempts, since "suicidal action or recurrent thoughts of suicide" is a symptom of depression. *Id.*

The majority correctly recognizes that "the evaluation [of APD] relies heavily on historical data from the patient and others . . ." and that the doctor in making this diagnosis must delve deeply "into performance in school, dealings with various school and legal authorities, job performance, and sexual and marital history." 3 Kaplan at 2822, 2824. The majority fails to recognize, however, that historical data obtained solely from secondhand sources may lack critical information and will invariably be inferior to historical data obtained in a clinical interview of the subject. As recognized in Kaplan, the "interpersonal and interactional characteristics [of APD] are usually elicited in the clinical interview." *Id.* at 2822.[5] Further, the lack of a personal interview deprives the expert of the ability to test various hypotheses and make the differential diagnosis which is crucial to a diagnosis of APD. 3 Kaplan at 2924. The risks of relying solely on secondhand information are demonstrated in the case at hand by Dr. White's failure to determine Daniels' mental status and her failure to discern the nature of defendant's substance abuse.

5. Although not expressly stated, Kaplan seems to contemplate that any diagnosis of APD will necessarily entail a personal interview. It concludes the passage referred to in the text by stating that "[a]ny data from other sources are useful." 3 Kaplan at 2924.

Thus, while failure to conduct a personal clinical interview may not be fatal to the admission of all expert mental health testimony in all cases, under the circumstances here it rendered Dr. White's differential diagnosis unreliable.

Other jurisdictions under similar circumstances have held psychiatric diagnoses inadmissible in the absence of a personal clinical interview of the subject. In *Holloway v. State*, 613 S.W.2d 479, 502-03 (Tex. App. 1981), an expert witness for the State testified as to defendant's future dangerousness. Although the expert had spoken with a co-defendant, the defendant's mother, and arresting and interrogating officers, the court ordered a new trial because the expert's failure to interview the defendant caused his testimony to lack "any value" and rendered it inadmissible. In *People v. Wilson*, 518 N.Y.S.2d 690, 693, 133 A.D.2d 179, 183-84 (N.Y. App. 1987), the court reversed the trial court for permitting a forensic psychologist, who had witnessed defendant only through his testimony in court, to testify as to defendant's mental capacity. The court reasoned that since the record did not establish that the process used for the psychological evaluation was a "reliable substitute for clinically derived evaluation of a subject's mental processes," the opinion lacked a proper foundation. In *Hill v. State*, 339 So.2d 1382, 1384-85 (Miss. 1976), the Mississippi Supreme Court reversed the trial court for permitting a psychiatrist to testify that defendant had no psychiatric illness since the psychiatrist interviewed the defendant for only seventy-five minutes and recommended further testing.[6]

6. Numerous decisions from other jurisdictions recognize the integral role of the personal interview to a reliable psychological diagnosis. In *Rollerson v. United States*, 343 F.2d 269, 274 (D.C. Cir. 1964) the court stated:

The basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject. More than three or four hours are necessary to assemble a picture of a man . . . . From hours of interviewing, and from the tests and other materials, a skilled psychiatrist can construct an explanation of personality and inferences about how such a personality would react in certain situations. (Citations omitted.)

*See also State v. Edmon*, 28 Wash. App. 98, 621 P.2d 1310 (1981) (A psychiatrist giving an evaluation of the defendant must personally interview him.); *United States v. Albright*, 388 F.2d 719, 725 (4th Cir. 1968) (An interview is the only "reliable means" of determining the defendant's sanity.); *People v. Bassett*, 69 Cal. 2d 122, 70 Cal. Rptr. 193, 443 P.2d 777 (1968) (A psychiatric opinion not based on an interview is not "substantial" so as to rebut defendant's expert opinion that he lacked capacity.); *Zirt v. Pollock*, 25 A.D.2d 920, 270 N.Y.S.2d 85 (1966) (An evaluation of a testator's competency that lacks a personal interview is "weak[]."); *see also In re Agent Orange Product Liability Litigation*, 611 F. Supp. 1223, 1250-56 (D.C.N.Y. 1985), *aff'd*, 818 F.2d 187 (1987), *cert. denied sub nom. Lombardi v. Dow Chem. Co.*, 487 U.S. 1234, 101 L. Ed. 2d 932 (1987) (Testimony by experts as to causation lacked a sufficient foundation where the

**STATE v. DANIELS**

[337 N.C. 243 (1994)]

The majority deals with the weaknesses underlying Dr. White's opinion with use of the general principle that deficiencies in a particular piece of evidence affect the weight of that evidence and not its admissibility. That principle, however, has no applicability where the reliability falls below a judicially acceptable level. In *State v. Peoples*, for example, we held that "[h]ypnotically refreshed testimony is simply too unreliable to be used as evidence in a judicial setting." 311 N.C. 515, 532, 319 S.E.2d 177, 187 (1984). Recognizing the "scholarly literature" on hypnosis, which indicated that "hypnosis has not reached a level of scientific acceptance," and our need to "defer" to that expertise, we expressly overruled earlier cases holding that deficiencies in such testimony affect weight and not admissibility. *Id.* at 519, 533, 319 S.E.2d at 180, 188. *See also State v. Foye*, 254 N.C. 704, 708, 120 S.E.2d 169, 172 (1961) (results of lie detector test are inadmissible largely because there is "no general scientific recognition of the efficacy of such tests" and such tests are "correct in their diagnosis" only seventy-five percent of the time). Concerning expert opinion testimony, this Court has repeatedly held that substantial shortcomings underlying such testimony which render it inherently unreliable require that it be excluded. *See State v. Clark*, 324 N.C. 146, 377 S.E.2d 54; *State v. Rogers*, 323 N.C. 658, 374 S.E.2d 852; *Donovant v. Hudspeth*, 318 N.C. 1, 347 S.E.2d 797; *Service Co. v. Sales Co.*, 259 N.C. 400, 131 S.E.2d 9; *Branch v. Dempsey*, 265 N.C. 733, 145 S.E.2d 395.

Finally, there is a reasonable possibility that the admission of Dr. White's testimony affected the jury's decision to sentence defendant to death. *See* N.C.G.S. § 15A-1443(a) (1988). The State's case for death was substantially enhanced by Dr. White. She testified, in summary, that Daniels was unremorseful, his suicide efforts were mere "gestures" and a "scheme" to gain sympathy, his letter to the Governor was "cunning" and "grandstanding," he suffered from untreatable antisocial personality disorder, and he was aware of his levels of aggression and violence at the time of the offenses.

We do not know how many jurors might have rejected some of the mitigating circumstances found by one or more jurors on the basis of this testimony. We do know the jury unanimously rejected the mitigating circumstance of remorse and found that the aggravating and mitigating circumstances warranted the imposition of death.

experts failed to take into account plaintiffs' specific medical histories and habits; court also based its decision on the fact that the experts failed to rule out other possible causes.); *Emigh v. Consolidated Rail Corp.*, 710 F. Supp. 608, 612-13 (W.D. Pa. 1989) (Since doctors who testified that plaintiff died of asbestosis had not interviewed or examined plaintiff and since it was not clear from record whether they knew of or considered the effect of plaintiff's smoking, their opinions were unreliable and inadmissible.).

Based on the error in the admission of the testimony of Dr. White and on its likely prejudicial effect, defendant should be awarded a new sentencing hearing.